**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Ft. Pierce Division**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CALUSA WATERKEEPER; and WATERKEEPER ALLIANCE, *Plaintiffs,* v. U.S. ARMY CORPS OF ENGINEERS; COL. ANDREW KELLY, in his official capacity as Commander and District Engineer of the U.S. Army Corps of Engineers; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of Interior; NATIONAL MARINE FISHERIES SERVICE; DR. ROY E. CRABTREE, in his official capacity as Regional Administrator of the Southeast Regional Office of National Marine Fisheries Service; U.S. FISH AND WILDLIFE SERVICE; and MARGARET EVERSON, in her official capacity as Principal Deputy Director of U.S. Fish and Wildlife Service, *Defendants.* | Civil No: |

**PLAINTIFFS' COMPLAINT FOR**

**DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1.     Plaintiffs, Center for Biological Diversity, Calusa Waterkeeper, and Waterkeeper Alliance (collectively, Conservation Organizations), bring this lawsuit against the U.S. Army Corps of Engineers (Corps), U.S. Fish & Wildlife Service (FWS), and National

Marine Fisheries Service (NMFS) regarding the Lake Okeechobee Regulation Schedule (LORS) and the Corps' unmitigated releases of Lake Okeechobee water into the Caloosahatchee and St. Lucie rivers and estuaries. These releases are killing countless marine species, harming human health, crippling local economies, and violating U.S. laws enacted to protect the environment.

2.     The Corps, in analyzing the effects of LORS and in consulting with FWS and NMFS on the effects of LORS on Florida's most imperiled species, intended LORS to be in effect for only three years, or until around 2010 when the Corps expected Herbert Hoover Dike repairs and components of the Comprehensive Everglades Restoration Plan (CERP) to be completed.

3.     None of those triggers have come to pass: Herbert Hoover Dike repairs remain ongoing, few CERP projects have been completed, and now the Corps claims it will continue to manage Lake Okeechobee under LORS until at least 2022.

4.     The Corps' discharges under LORS are polluted with toxic algae and nutrients, and are causing significant adverse impacts to the Caloosahatchee and St. Lucie rivers and their estuaries.

5.     The impacts of these discharges often coincide in time and location with persistent, deadly red tide.

6.     These discharges adversely impact species listed under the Endangered Species Act (ESA), like Florida manatees, smalltooth sawfish, Johnson's seagrass, sea turtles, and coral.

7.     Past environmental analyses of LORS under the National Environmental Policy Act (NEPA) and ESA did not consider the long-term impacts of high-volume discharges beyond three years, discounted the effects of harmful algal blooms, and entirely failed to consider how climate change might affect LORS and harmful algal blooms.

8.     The Corps has not supplemented its NEPA analysis on LORS, despite significant new circumstances that relate to the environment – which include the long-term implementation of LORS and harmful algal blooms, in violation of NEPA and the Administrative Procedure Act (APA).

9.      The Corps has not reinitiated formal consultation with FWS and NMFS under Section 7 of the ESA, in violation of the ESA and APA.

10.     FWS' issuance of, and the Corps' reliance upon, FWS' 2018 biological opinion regarding LORS are in violation of the ESA and APA.

11.     NMFS' issuance of, and the Corps' reliance upon, NMFS' 2015 concurrence letter regarding LORS are in violation of the ESA and APA.

12.     The failure of the Corps to utilize its authorities regarding LORS in furtherance of the purposes of the ESA is in violation of the ESA and APA.

13.     Conservation Organizations respectfully request that this Court declare that the Corps is violating NEPA by failing to supplement its LORS NEPA analysis; that the Corps, FWS, and NMFS are violating the ESA by failing to reinitiate formal consultation; that the Corps, FWS, and NMFS are violating the ESA by preparing and relying upon unlawful biological opinions; and that the Corps is violating the ESA in failing to utilize its authorities to conserve listed species. Conservation organizations further ask that this Court order the Corps to supplement its NEPA analysis of LORS; order the Corps, FWS, and NMFS to reinitiate formal consultation under Section 7 of the ESA; and enjoin the Corps from further harming listed species until the Corps lawfully complies with the statutory and regulatory demands of the ESA, NEPA, and the APA.

## II. PARTIES

14.     Plaintiff Center for Biological Diversity (Center) is a non-profit 501(c)(3) organization with more than 1.4 million members and supporters across the country, including in Florida. The Center's Florida office is in St. Petersburg, Florida. The Center's mission is to protect and conserve endangered species and their habitats. Pursuant to that mission, the Center advocates for the strongest protections for the nation's waters.

15.     Center members advocate for the protection of Florida's surface waters and engage in water-based recreational activities such as fishing, boating, kayaking, canoeing, bird watching, and nature observation on and in surface waters throughout the state, including Lake Okeechobee, the Caloosahatchee River and Estuary, and the St. Lucie

River and Estuary. The Center and its members are concerned with the conservation of imperiled species impacted by the Corps' discharges of algae and nutrient-rich water from Lake Okeechobee.

16.     The Center has members who visit areas where there are Florida manatees, smalltooth sawfish, Johnson's seagrass, sea turtles, and coral. The Center's members use these areas for observation of these species and other wildlife, research, nature photography, aesthetic enjoyment, recreation, education, and other activities. The Center's members derive professional, aesthetic, spiritual, recreational, economic, informational, and educational benefits from these species and their habitat. These members have concrete plans to continue visiting and recreating in areas where they can observe these species and their habitat.

17.     The Center and its members' interests are adversely affected by the Corps', NMFS', and FWS' failure to comply with the ESA. These agencies' actions are harming the prospects of recovery for these imperiled species and may be jeopardizing their ability to survive.

18.     The Center and its members also have a procedural interest in seeing the Corps, FWS, and NMFS comply with their legal obligations, and they suffer procedural injury from the agencies' failure to do so.

19.     Unless the requested relief is granted, the Center's interests and the interests of its members will continue to be adversely affected and injured by the agencies' failure to protect these species from jeopardy. The injuries described above are actual, concrete injuries presently suffered by the Center and its members, and the injuries will continue to occur unless this Court grants the requested relief.

20.     Plaintiff Calusa Waterkeeper is a non-profit organization dedicated to the protection of the Caloosahatchee River and Estuary in Southwest Florida. The organization strives to improve the waters in the region, including riparian and estuarine systems, wildlife habitat, and marine life. Calusa Waterkeeper monitors the health of waters in its jurisdiction and has seen the adverse effects of LORS discharges on the Caloosahatchee River and Estuary.

21.     Calusa Waterkeeper and its members are substantially and adversely affected by the conditions resulting from nutrient-rich water discharges from Lake Okeechobee into the waters it monitors. Due to LORS, the Caloosahatchee river often suffers from too much freshwater in the wet season, and not enough freshwater in the dry season. The resulting long-term degradation and destruction of natural habitat for wildlife along these rivers and estuaries directly affects members of the organization who enjoy and value their use of the resource. These impacts will have a substantial and adverse effect on the quality of life and property values of Calusa Waterkeeper's members.

22.     Harmful algal blooms, cyanobacteria, and *Karenia brevis* (red tide) have been causing major problems in the Calusa Waterkeeper's region and LORS discharges are a major contributor to these events. Harmful algal blooms have severe impacts on human health, aquatic ecosystems, and the local economy; they adversely impact Calusa Waterkeeper's interest in a healthy Caloosahatchee Estuary.

23.     LORS discharges continue to impair, pollute, and otherwise injure Florida's natural resources, directly and cumulatively, which significantly injures Calusa Waterkeeper and its members.

24.     Calusa Waterkeeper's members share the organization's goal of ensuring that native areas of Florida—which are areas of national importance—are preserved and protected.

25.     Calusa Waterkeeper and its members also have a procedural interest in seeing the Corps, FWS, and NMFS comply with their obligations, and they suffer procedural injury from the agencies' failure to do so.

26.     Plaintiff Waterkeeper Alliance is a not-for-profit corporation organized under the laws of the State of New York, and is a charitable corporation under section 501(c)(3) of the Internal Revenue Code. Waterkeeper Alliance maintains its headquarters in New York, New York. Waterkeeper Alliance is a global movement of on-the-water advocates who patrol and protect over 2.5 million square miles of rivers, streams, and coastlines in North and South America, Europe, Australia, Asia, and Africa. Waterkeeper Alliance seeks to protect water quality in every major watershed around the world, and to restore

and maintain all waterways as drinkable, fishable, and swimmable for the benefit of communities that rely on these precious inland and coastal resources.

27.     Waterkeeper Alliance works toward this vision through direct advocacy and through the grassroots advocacy of its Waterkeeper Member and Affiliate Organizations ("Waterkeeper Organizations"), which are connected and supported by Waterkeeper Alliance to provide a voice for waterways and their communities. Waterkeeper Alliance (1) supports and empowers Waterkeeper Organizations to protect communities, ecosystems, and water quality; (2) promotes the Waterkeeper model for watershed protection worldwide; and (3) advocates for issues common to Waterkeeper Organizations.

28.     Waterkeeper Alliance currently connects more than 340 Waterkeeper Member Organizations and Affiliate Organizations in 44 countries on 6 continents. This includes approximately 151 Basinkeepers, Baykeepers, Bayoukeepers, Canalkeepers, Channelkeepers, Coastkeepers, Creekkeepers, Inletkeepers, Lakekeepers, Riverkeepers, Shorekeepers, Soundkeepers, and Waterkeepers chartered and licensed by Waterkeeper Alliance in the United States ("U.S. Member Organizations") and approximately 19 Waterkeeper affiliate organizations in the United States ("U.S. Affiliate Organizations"). Many of Waterkeeper Alliance's U.S. Member and Affiliate Organizations are actively working to protect their watersheds from nutrient pollution. This includes 13 U.S. Member Organizations overseeing separate water basins throughout the State of Florida, including Calusa Waterkeeper.

29.     Waterkeeper Alliance supports its U.S. Member and Affiliate Organizations, and individual members of these organizations, in a number of ways. For example, Waterkeeper Alliance engages in direct litigation and other advocacy in coordination with these organizations, and provides a centralized hub for sharing scientific, legal, and administrative resources with these programs across the country. Waterkeeper Alliance expands local Waterkeeper abilities' to address environmental issues, helps provide legal support to member programs, and protects and administers the trademarks covering the U.S. Member Organization license names described above.

30.     Waterkeeper Alliance also has approximately 12,000 individual members that support Waterkeeper Alliance through financial contributions. Waterkeeper Alliance supports these members by advocating on behalf of their interests in local and national forums, including legislative bodies, government agencies, and courts of law, and by keeping them informed about environmental issues that impact their communities and others around the country. Some of these members live, work, and recreate in areas affected by nutrient pollution. Additionally, these U.S. Member and Affiliate Organizations cumulatively have tens of thousands of individual members who live, work and recreate on waterways and in watersheds across the United States. Many of these members live, work, and recreate in areas affected by nutrient pollution.

31.     Waterkeeper Alliance's mission is to make all waters, including Florida's waters, swimmable, drinkable, and fishable, and Waterkeeper Alliance is concerned that the continued released of water rich in cyanotoxins and harmful algae from Lake Okeechobee under LORS is making this goal impossible in the Caloosahatchee and St. Lucie estuaries. The effects of these releases continue to harm their environmental, aesthetic, and recreational interests in Florida's waterways.

32.     Waterkeeper Alliance has Member Organizations in Florida that are specifically concerned about the destructive effects of LORS releases of nutrient and algae-rich water on the Caloosahatchee and St. Lucie estuaries in Florida, as well as the Gulf and Atlantic coastlines, including the individual and cumulative effects of LORS discharges to Florida habitat and wildlife, especially federally listed species. Waterkeeper Alliance, U.S. Member Organizations and their respective members will sustain injury from the actions alleged, including Calusa Waterkeeper and its members.

33.     Waterkeeper Alliance and its U.S. Member Organizations further have a procedural interest in seeing the Corps, NMFS, and FWS comply with their obligations, and they suffer procedural injury from the agencies' failure to do so.

34.     Defendant U.S. Army Corps of Engineers is an agency of the United States and a subdivision of the U.S. Department of the Army, which is in the U.S. Department of

Defense. The Corps is responsible for Lake Okeechobee discharges to the Caloosahatchee and St. Lucie rivers.

35.     Defendant Colonel Andrew Kelly is the District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is also responsible for ensuring that the Corps complies with the requirements of the ESA, NEPA, and the APA. Defendants U.S. Army Corps of Engineers and Col. Andrew Kelly, in his official capacity as District Commander, have waived sovereign immunity pursuant to 5 U.S.C. § 702, 33 U.S.C. § 1365, and 16 U.S.C. § 1540(g).

36.     Defendant Department of Interior is an agency of the United States charged with administering the ESA for non-marine species and the Florida manatee.

37.     Defendant David Bernhardt is the Secretary of the Interior. As Secretary of the Interior, he has the ultimate responsibility to enforce and implement the provisions of the ESA. Defendant Bernhardt is sued in his official capacity.

38.     Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the ESA through the APA and other federal laws.

39.     Defendant Margaret Everson is the Principal Deputy Director of the U.S. Fish and Wildlife Service. As Deputy Director, Defendant Everson is the federal official vested with responsibility for enforcing the ESA and its joint regulations. Defendant Everson is sued in her official capacity.

40.     Defendant National Marine Fisheries Service is an agency of the United States charged with administering the ESA for marine species.

41.     Defendant National Marine Fisheries Service is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the ESA through the APA and other federal laws.

42.     Defendant Dr. Roy E. Crabtree is the Regional Administrator of the National Marine Fisheries Service for the Southeast Regional Office in St. Petersburg, Florida. As Regional Administrator, Defendant Dr. Crabtree is the federal official vested with

responsibility for enforcing the ESA and its joint regulations. Defendant Dr. Crabtree is sued in his official capacity.

43.    Defendants U.S. Fish and Wildlife Service; Department of the Interior; David Bernhardt, in his official as Secretary of the Interior; Margaret Everson, in her official capacity as Deputy Director of the U.S. Fish and Wildlife Service; and Dr. Roy E. Crabtree, in his official capacity as Regional Administrator for the National Marine Fisheries Service, have waived sovereign immunity pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

44.    Defendants Corps, FWS, and NMFS are agencies of the federal government, which may be named as defendants and against which a writ in the nature of mandamus, a declaratory judgment, and injunctive relief may be entered pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65(a). The Corps is the action agency for purposes of environmental review under the ESA and NEPA. Likewise, FWS is the action agency under the ESA for non-marine species and the Florida manatee, and NMFS is an action agency under the ESA for marine species.

### III. JURISDICTION AND VENUE

45.    Conservation Organizations bring this action under the ESA, 16 U.S.C. §§ 1536, 1540(g); NEPA, 42 U.S.C. §§ 4321-4370e; and the APA, 5 U.S.C. § 706.

46.    This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA judicial review provisions); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiffs); and 16 U.S.C. § 1540(g) (ESA citizen suit provision). The relief requested is authorized by 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); 5 U.S.C. §§ 701-706; and 16 U.S.C. § 1540(g).

47.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants federal district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

48.     Conservation Organizations provided legally sufficient notice to Defendants of their intent to file suit under the ESA more than 60 days prior to filing this complaint, consistent with the Act's statutory requirements.[1] 16 U.S.C. § 1540(g)(2). Defendants have not remedied the issues raised in that notice.[2] Conservation Organizations have exhausted all administrative remedies, the agencies' actions are final and ripe for review, and Conservation Organizations have standing to bring these claims.

49.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because the Corps, FWS, NMFS are agencies of the United States and have committed and continue to commit the unlawful conduct alleged herein in Highlands, Okeechobee, St. Lucie, Martin, Palm Beach, Hendry, Glades, Charlotte, Lee, Sarasota, and Manatee counties, Florida.

50.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## IV. STATUTORY AND REGULATORY FRAMEWORKS

## A. NATIONAL ENVIRONMENTAL POLICY ACT

51.     NEPA is the Nation's charter for the protection of our environment. 40 C.F.R. § 1500.1(a).

52.     The purpose of NEPA is to "insure that environmental information is available to public officials and citizens *before* decisions are made and actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c) (emphasis added). To this end, NEPA requires federal agencies to prepare a detailed Environmental Impact Statement (EIS) for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

---

[1] Exhibit 1 – 60-Day Notice of Endangered Species Act Violations Regarding the Lake Okeechobee Regulation Schedule, Dec. 19, 2018.
[2] Exhibit 2 – Letter from Office of Counsel for the Department of the Army to Conservation Organizations, Mar. 21, 2019.

53.     "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (internal quotation marks omitted).

54.     The "human environment" is defined "comprehensively to include the natural and physical environment and the relationship of people with that environment." *Id.* § 1508.14.

55.     "Significantly," as used in NEPA, "requires considerations of both context and intensity." *Id*. § 1508.27. "Context" means how the project impacts "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Both short and long term effects are relevant." *Id.* "Intensity" refers to "the severity of impact." *Id.* § 1508.27(b).

56.     Factors an agency must consider in determining whether a project will have significant effects include the degree to which the proposed action affects public health or safety; the unique characteristics of the geographic area such as proximity to park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether the action is related to other actions with individually insignificant but cumulatively significant impacts (significance cannot be avoided by terming an action temporary or by breaking it down into small component parts); and the degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the ESA. *Id.*

57.     The EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) alternatives to the proposed action, (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332.

58.     Congress created the Council on Environmental Quality (CEQ) to promulgate regulations applicable to all federal agencies consistent with the intent and purposes of NEPA. *See* 40 C.F.R. § 1500 *et seq.*

59.     As part of the EIS, each federal agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). An agency must "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a)-(c). In addition, an agency "shall state how alternatives . . . will or will not achieve the requirements of section 101 and 102(1) of the Act" which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of national heritage" as well as how alternatives "will or will not achieve the requirements of . . . other environmental laws and policies." *Id.* § 1502.2(d).

60.     NEPA requires the consideration of reasonably foreseeable, direct, indirect, and cumulative impacts to the natural and physical environment. *See Id.* §§ 1508.7, 1508.8. Indirect effects are

> caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

*Id.* § 1508.8(b).

61.     Cumulative impacts result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. *Id.* § 1508.7.

62.     After completing and considering an EIS, the agency shall prepare a concise public record of decision stating the agency's decision, identifying all alternatives

considered, and stating whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. *Id.* § 1505.2. Until an agency issues a record of decision, no action concerning a proposal may be taken that would have an adverse environmental impact, or limit the choice of reasonable alternatives. *Id.* § 1506.1(a).

63.     Federal agencies have a continuing obligation to gather and evaluate new information relevant to the environmental impact of its actions. "An agency that has prepared an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look' at the environmental effects of [its] planned action, even after a proposal has received initial approval." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 373-74 (1989).

64.     An agency "[s]hall prepare supplements to either draft or final environmental impact statements if . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)-(2).

**B. ENDANGERED SPECIES ACT**

65.     The ESA, by way of its "language, history, and structure . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities" for protection under the law. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174 (1978).

66.     The purpose of the Endangered Species Act is in part "to provide a program for the conservation of . . . endangered species and threatened species" and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

67.     The secretaries of Interior and Commerce administer the ESA jointly through the U.S. Fish & Wildlife Service (FWS) and National Marine Fisheries Service (NMFS), respectively. The former has jurisdiction over terrestrial species, nonmarine aquatic species, and certain marine species, including sea turtles (while on land) and manatees. The latter has jurisdiction over marine species, including sea turtles (while in the water)

and anadromous fish.[3] The ESA contains several provisions that seek to conserve species in a number of different ways.

68.     If a federal project may affect an ESA-listed species, the federal agency engaged in the action must "consult" with FWS and/or NMFS under Section 7 of the ESA. Section 7 is the central enforcement provision that prohibits federal agencies from authorizing, funding, or otherwise carrying out any action that is likely to "jeopardize" the continued existence of an endangered species or result in the destruction or adverse modification of the species' critical habitat. *Id*. § 1536(a)(2). An action will cause "jeopardy" if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id*. § 402.02. "Destruction or adverse modification" of critical habitat means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. *Id*.

69.     The consultation process begins with the action agency requesting information from FWS and/or NMFS regarding whether any listed or proposed species may be present in the action area. *Id*. § 402.14(a). The "action area" means "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id*. § 402.02. If listed species may be present, the action agency may prepare a "biological assessment" to determine whether the listed species will likely be adversely affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If the action agency determines that the proposed action is likely to adversely affect a listed species or adversely modify its critical habitat, the agency must engage in formal consultation with the Service. 50 C.F.R. § 402.14. The threshold for triggering formal consultation is "very low" and "any possible effect . . . triggers formal consultation requirements." 51 Fed. Reg. 19,949 (June 3, 1986).

---

[3] Anadromous fish are born in freshwater, migrate to the ocean to grow as adults, and then return to freshwater to spawn.

70.     During formal consultation, FWS and/or NMFS must review all relevant information, evaluate the status of the listed species, "evaluate the effects of the action and cumulative effects on the listed species," and formulate its biological opinion as to "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species . . ." 50 C.F.R. § 402.14(g)(1)-(4).

71.     The evaluation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536 (a)(2). This process culminates in the issuance of a "biological opinion" explaining how the proposed action will affect the listed species or critical habitat. *Id*. § 1536(b); 50 C.F.R. § 402.14.

72.     If the biological opinion concludes that the proposed action will "jeopardize the continued existence" of a listed species or adversely modify its critical habitat, the biological opinion must outline "reasonable and prudent alternatives" to the proposed action. 16 U.S.C. § 1536(b)(3)(A). If, on the other hand, the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, but may "take" a listed species, the Service must provide an incidental take statement ("ITS") that specifies "the impact, i.e., the amount or extent, of . . . incidental taking" that may occur. 50 C.F.R. § 402.14(h)(3).

73.     To "take" an endangered or threatened species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, or "to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

74.     "Harm" includes significant habitat modification or degradation that results in death or injury to listed species "by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

75.      "Harass" is defined as intentional or negligent actions that create a likelihood of injury to listed species "to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.*

76.    Congress intended the term "take" to be defined in the "broadest possible manner to include every conceivable way" a person could harm or kill fish or wildlife. *See* S. Rep. No. 93-307, at 7 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.

77.    The ITS specifies the amount or extent of such incidental taking on the listed species, provides "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize such impact, and sets forth the "terms and conditions" that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In addition, when the listed species to be taken are marine mammals, the take must first be authorized pursuant to the Marine Mammal Protection Act (MMPA) and the ITS must include any additional measures necessary to comply with the MMPA take authorization. 50 C.F.R. § 402.14(h)(3).

78.    To monitor the impacts of incidental take, the action agency must monitor and report the impact of its action on the listed species to the Service as specified in the incidental take statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1)(iv), 402.14(i)(3). If, during the course of the action, the amount or extent of incidental taking is exceeded, the action agency must re-initiate formal consultation with the Service immediately. 50 C.F.R. § 402.14(i)(4).

79.     Thus, the ITS functions both as a safe harbor provision immunizing persons from liability as well as a "trigger" for future formal consultation if, and when, the level of take authorized in the ITS is ever exceeded.

80.    Compliance with the biological opinion and its incidental take statement protects federal agencies, and others acting under the biological opinion, from enforcement action under ESA Section 9's prohibition against take; 16 U.S.C. §§ 1536(o)(2); 1538(a); 50 C.F.R. § 17.31(a). However, take not in compliance with a biological opinion or absent a valid take statement or take permit is in violation of Section 9 of the ESA.

81.    Even after the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity is not likely to cause jeopardy to a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed

biological opinion cannot satisfy its duty to avoid the likelihood of jeopardy to listed species.

82.     Reinitiation of formal consultation is required and shall be requested by the Federal agency or by FWS and/or NMFS, where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

  (a)     If the amount or extent of taking specified in the incidental take statement is exceeded;

  (b)     If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

  (c)     If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

  (d)     If a new species is listed or critical habitat designated that may be affected by the identified action. 50 C.F.R. § 402.16.

83.     Furthermore, once the agencies reinitiate formal consultation, Section 7(d) of the Act states that the action agency, "shall not make any irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d).

84.     Congress enacted Section 7(d) "to ensure that the status quo would be maintained during the consultation process, to prevent agencies from sinking resources into a project in order to ensure its completion regardless of its impacts to endangered species." *Washington Toxics v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005).

85.     Federal agencies have additional responsibilities under Section 7(a)(1) of the ESA, including a requirement that they "utilize their authorities in furtherance of the purposes of [the Act]" and to "carry[ ] out programs for the conservation of" listed species. 16 U.S.C. § 1536(a)(1).

86.    The ESA defines "conservation" to mean the use of "all methods and procedures" that are necessary to recover a listed species to the point where protections under the act are no longer necessary. *Id.* at 1532(3). Thus, section 7(a)(1) requires each federal agency to ensure that its actions are consistent with the recovery of listed species. *See* 50 C.F.R. § 402.15(a) (explaining that it is each agency's continuing obligation to "determine whether and in what manner to proceed with the action in light of its section 7 obligations" to protect and recover listed species).

### C. ADMINISTRATIVE PROCEDURE ACT

87.    Pursuant to the APA, any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. 5 U.S.C. § 702.

88.    Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA also requires a reviewing court to:

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]

>>  . . .

>> (D) without observance of procedure required by law . . . .

*Id.* § 706(1)-(2).

89.    The Corps' failure to supplement its NEPA analysis is reviewable under the APA.

90.    The Corps', FWS', and NMFS' failure to reinitiate formal consultation is reviewable under the APA.

91.    The FWS' and NMFS' issuance of biological opinions are final agency actions reviewable under the APA. *See id.* § 704.

## V. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Greater Everglades Ecosystem

92.     Lake Okeechobee, the Caloosahatchee River and Estuary, and the St. Lucie River and Estuary are part of the Greater Everglades Ecosystem which stretches from Orange County to Monroe County.

93.     Lake Okeechobee is the second largest fresh water lake entirely within the United States, and is often referred to as the "liquid heart" of the Everglades.

94.     The lake surface is about 35 miles north to south and 30 miles east to west, and prior to drainage and dike construction it was 970 square miles.

95.     It is now 730 square miles, on average only 10 feet deep, and is home to alligators, snail kites, bald eagles, crested caracara, Florida manatees, and grasshopper sparrows.





*Army Corps, May 24, 2019, Dam Safety and Herbert Hoover Dike PPT*

96.     Water from the Kissimmee River basin and rainfall from as far north as Orlando ultimately empties into the lake.

97.     The 67-mile long Caloosahatchee River travels from the west side of Lake Okeechobee through Glades, Hendry, and Lee counties before finally meeting the Gulf of Mexico. The river and estuary are home to the only known pupping grounds of the federally endangered smalltooth sawfish; are an important warm water refuge for the federally threatened Florida manatee; and five species of ESA-listed sea turtles frequent the estuary and nearby Gulf of Mexico: loggerhead, green, Kemp's ridley, hawksbill, and leatherback.

98.     Five national wildlife refuges are within the Caloosahatchee River and Estuary, including J.N. "Ding" Darling National Wildlife Refuge, Pine Island National Wildlife Refuge, Matlacha Pass National Wildlife Refuge, Island Bay National Wildlife Refuge, and Caloosahatchee National Wildlife Refuge.

99.     On the east side of Lake Okeechobee, the St. Lucie River and Estuary is a 7-mile long system that makes its way from Lake Okeechobee through St. Lucie and Martin counties where it meets up with the greater Indian River Lagoon system, which is recognized as one of the most diverse estuarine environments in North America with more than 4,300 plant and animal species. ESA-listed sea turtles, smalltooth sawfish, and manatees rely on these waters for warm water refuge, fresh water, and other essential habitat functions. ESA-listed boulder star, elkhorn and staghorn coral are found off the coast near the estuary's outlet.

100.    The lagoon also supports productive fisheries and tourism, and some of the only bioluminescent waters in the continental United States. The St. Lucie River is an Outstanding Florida Water and the North Fork of the St. Lucie is a state aquatic preserve and part of Florida's "Save Our Rivers" program.

**B.      Everglades Destruction and Restoration**

101.    More than a century ago, efforts were made to drain the Everglades for development, agricultural production, and flood control. In 1910 a small muck levee was constructed on the southern shore of Lake Okeechobee. Hurricanes in 1926 and 1928

caused storm surge from the lake to breach the mud dike and killed more than 2,500 people.

102.    In the 1930s, the Corps built 67.8 miles of levee along the south shore of the lake and 15.7 miles of levee along the north shore.

103.    In 1948, Congress enacted the Central and South Florida (C&SF) project to provide flood control; water supply for municipal, industrial, and agricultural uses; prevention of saltwater intrusion; water supply for Everglades National Park; recreation; and protection of fish and wildlife resources. To accomplish these objectives, the Corps constructed a network of levees, water storage areas, pumps and canals in south Florida, which further altered the nature of the ecosystem.

104.    The Herbert Hoover Dike was completed by the 1960s.

105.    In the 1980s and 1990s, seepage and stability problems in the Herbert Hoover Dike were discovered, and in 1999, the Corps developed a plan to rehabilitate it.

106.    In 2000, Congress approved the Comprehensive Everglades Restoration Plan (CERP), a $10.5 billion, 35-year-plus project to restore central and south Florida water resources, including Lake Okeechobee and the Everglades.

107.    These restoration projects, consisting of reservoirs, stormwater treatment areas, natural lands, flow-equalization basins, and other features, are intended to work in tandem to store, treat, and convey water to where it is needed most, namely Everglades National Park and Florida Bay.

108.    Nineteen years later, several CERP projects have been implemented but many more await congressional funding. Recent reviews by the National Academy of Sciences have found that more projects may need to be done in the face of climate change and sea level rise to supply enough clean, freshwater to the natural system.

109.    Meanwhile, pollutants from agriculture, industry, and urban areas have polluted Everglades waters with phosphorous, nitrogen, and mercury.

110.    The nutrient rich water from Lake Okeechobee, coupled with high water temperatures, fuels algal blooms on the lake.

111.    The Corps sends the lake's water to the estuaries.

112.    These nutrient-rich, algae-laden waters synergistically interact with red-tide, amplifying the harm caused to marine life along Florida's coasts.

113.    These algal blooms kill marine life, and are a human health hazard.

114.    The Department of Interior has acknowledged that Lake Okeechobee discharges impact water quality at the refuges, contributing to "red tides, eutrophication, impaired water bodies, mercury contamination, and pesticides and polychlorinated biphenyls," and has described impacts from dry season lack of flows as allowing "saltwater from the Gulf of Mexico to migrate into brackish estuaries and up the Caloosahatchee River, thus raising the salinities of San Carlos Bay and the waters of the refuges." U.S. Department of the Interior, 2010, J.N. "Ding" Darling National Wildlife Refuge Comprehensive Conservation Plan.

**C.    The Corps' Management of Lake Okeechobee and LORS**

115.    The Corps is responsible for establishing a regulation schedule for managing the water levels in Lake Okeechobee. The schedule is not part of CERP, and has operated under several different regulatory regimes throughout the years, including the "Run 22" schedule in 1988, the "Run 25" schedule in 1992, and the Water Supply and Environment (WSE) schedule in 2000.

116.    During the 2004 and 2005 hurricane seasons, the lake sustained high water levels and the Corps released high volumes of water to the estuaries which led to poor ecological conditions in the Caloosahatchee and St. Lucie estuaries.

117.    In 2007, the Corps established LORS to replace the WSE to address periods of high water events, to preserve the integrity of the dike, to protect ecological resources of the lake's littoral zone, and to reduce high discharges to the estuaries.

118.    LORS is a compilation of operating criteria and guidelines for the storage and release of water from Lake Okeechobee to the Caloosahatchee Canal (C-43) and the St. Lucie Canal (C-44).

119.    As illustrated below, the Corps' operations have resulted in the discharge of billions of gallons of polluted water into the coastal estuaries to the east and west, where

it is not needed; and prevented clean, freshwater from moving south into Everglades National Park and Florida Bay, where it is desperately needed.



*Army Corps, May 30, 2019, Lake Okeechobee Regulation Schedule (LORS 2008) PPT*

120.    The Corps expects to operate under LORS until the earlier of (1) the Herbert Hoover Dike repairs have been completed, specifically Herbert Hoover Dike seepage berm construction or equivalent dike repairs for reaches 1, 2, and 3 (as depicted below as the three southern reaches labeled R-1, R-2, and R-3); or (2) when certain CERP projects have been completed.



*Army Corps, May 24, 2019, Dam Safety and Herbert Hoover Dike PPT*

121.    The Corps originally anticipated operating under this interim schedule only until 2010, which is when at least one of the two triggering events was expected to occur.

122.    In 2006, the Corps estimated that the three relevant "reaches" or sections of the lake repairs would be completed in March 2010 (Reach 1), 2012 (Reach 3), and 2013 (Reach 2).

123.    The 2016 Herbert Hoover Dike Dam Safety Modification Study proposed a revised rehabilitation plan for the Herbert Hoover Dike.

124.    The goal of repairing the dike is to make the dike safe under the current LORS schedule; however, even when repaired, the dike will not provide a final solution for managing lake levels.

125.    Although the Corps completed most aspects of Reach 1 repairs, repairs to Reach 2 and 3 are now scheduled to be completed by 2022.

126.    Progress on the triggering events has been slow, and funding has been inconsistent.

127.    The Corps recently announced it is evaluating how it will manage Lake Okeechobee once the Herbert Hoover Dike repairs are completed, now projected to occur in 2022.

128.    This new management schedule is called Lake Okeechobee System Operating Manual or "LOSOM" and will replace LORS once the Herbert Hoover Dike repairs are completed.

129.    The Corps will operate under LORS until it implements LOSOM.

130.    The Corps will not implement LOSOM until Herbert Hoover Dike repairs are finally completed.

131.    On January 30, 2019, 21 conservation organizations asked the Corps to expedite its review of LOSOM to immediately address the ongoing seasonal high volume discharges and harmful algal blooms and to not wait until Herbert Hoover Dike repairs are completed, given the repeated missed deadlines and the Corps' own finding that even when repaired, the dike will not provide a final solution for managing lake levels.

132.    The Corps did not provide a substantive response to the Jan. 30, 2019 letter.

133.    The Corps, FWS, and NMFS consider LORS an ongoing federal agency action.

**D. The Corps Discharges Algae-Laden Water from Lake Okeechobee**

134.    Harmful algae blooms are making people sick, killing and injuring wildlife, and negatively impacting Lake Okeechobee and the coastal estuaries. Urban, industrial, and agricultural wastes, coupled with rising temperatures and changes in precipitation due to climate change, are contributing to the increased intensity, frequency, and magnitude of harmful algal blooms and the production of cyanotoxins.

135.    Under LORS, the Corps flushes large volumes of algae-laden water from Lake Okeechobee to the Caloosahatchee and St. Lucie rivers and estuaries, killing countless

fish and wildlife, adversely affecting critical seagrass beds, impacting human health, and severely impacting local economies.

136.    The discharged water is rich in nutrients and algae and dilutes the normally saline water downstream, creating conditions for the growth and survival of intense cyanobacteria blooms in the estuaries.

137.    In 2005, following several strong tropical storms, toxic blooms formed in Lake Okeechobee and were discharged downstream into the St. Lucie Estuary.

138.    In June 2008, a toxic blue-green algae bloom occurred east of the Franklin Lock on the Caloosahatchee River and forced the temporary shut-down of the Olga Water Treatment Plant, which obtains its source water from the Caloosahatchee and provides drinking water for 30,000 people.

139.    In 2013, after tropical storms, the Corps once again discharged blooms in Lake Okeechobee into the St. Lucie Estuary.

140.    In 2016, a 239-square mile harmful algal bloom occurred in Lake Okeechobee, during an almost-year long period of releases to the St. Lucie and the Caloosahatchee. Beaches were closed and then-Governor Rick Scott declared a state of emergency in Martin, St. Lucie, Palm Beach, and Lee counties.

141.    In 2017, heavy rain from Hurricane Irma and above-average rainfall in May 2018 set the stage for what was possibly the largest ever summer algal bloom in Lake Okeechobee, and also prompted the Corps to initiate multiple discharges of toxic algae-filled water into the St. Lucie and Caloosahatchee estuaries. Florida's Governor once again declared a state of emergency.

142.    The damaging discharges from Lake Okeechobee in 2005, 2008, 2013, 2016, and 2018 had a significant impact on the ecology of the estuaries and inflicted significant economic losses to commercial fishing, recreational tourism, and real estate.

143.    Harmful algal blooms have also killed family pets, forced local businesses to close, and diminished waterfront property values.

144.    Scientists have expressed increasing concern about the long-term health effects of families being exposed to cyanotoxins in Florida's waters.

145.    In addition to sustaining cyanobacteria blooms in the rivers and estuaries, the Corps' discharges are likely contributing to red tide harmful algae blooms as well.

***Cyanobacteria: Blue-Green Algae***

146.    Cyanobacteria, particularly microcystis, have been found in Lake Okeechobee and the estuaries. Exposure of *Microcystis aeruginosa* to saltwater may increase its toxicity.

147.    These cyanobacteria, or blue-green algae as they are commonly known, are hepatotoxins and are poisonous and carcinogenic.

148.    The non-protein amino acid, beta-N-methylamino-L-alanine (BMAA), is a cyanobacteria-derived toxin linked to neurodegenerative diseases like ALS (Amyotrophic Lateral Sclerosis) and Parkinsonism Dementia Complex (ALS/PDC).

149.    People near blue-green algae blooms have been found to have inhaled the toxins deeply into their lungs.

150.    BMAA can also biomagnify up some food chains and may pose an increasing human health risk. Therefore, there is concern that people exposed to waterborne BMAA may have an increased risk of neurodegenerative disease.

151.    BMAA concentrations in animals exposed to cyanobacteria have been observed in Florida, including moderate amounts in mollusks and high concentrations in fish in the Caloosahatchee River.

152.    Bottlenose dolphins can eat similar diets to humans (fish and crustaceans), and dolphins found dead in the Indian River Lagoon have similar concentrations of BMAA in their brains as humans that have died of neurodegenerative diseases.

153.    Water sampling for cyanobacteria during these harmful algal blooms have exceed the level the World Health Organization has determined to be hazardous for humans in recreational waters.

154.    Dozens of people have been hospitalized after being exposed to the toxic algae, which doctors describe as a health hazard.

### *Karenia brevis: Red Tide*

155.    Red tide is one of the most common chemical stressors impacting South Florida coastal and marine ecosystems, and studies suggests that nutrients including phosphorous and nitrogen from discharges as well as biomass killed by cyanobacteria can energize or reawaken red tide.

156.    Red tide is caused by the dinoflagellate *Karenia brevis* which produces brevetoxins that kill fish, make filter-feeding fish extremely toxic to other animals, and cause respiratory and intestinal distress in humans.

157.    Red tide has also been linked to land mammal and bird mortality, and can bioaccumulate. Exposed fish and seagrasses can accumulate high concentrations of brevetoxins and act as toxin vectors to dolphins and manatees. People generally do not become aware of its presence until it reaches above 100,000 cells/liter, which is when it leads to fish kills, shellfish toxicity, and respiratory distress.

158.    There has been an increase in red tide abundance and frequency in southwest Florida since 1954.

159.    Studies suggest that cyanobacteria may play an important role in providing fuel to initiate red tide blooms. The cyanobacteria synechococcus is a potential prey source for red tide. Synechococcus has been detected in the Lake Okeechobee system.

160.    Studies suggest that nutrients including phosphorous and nitrogen from discharges can energize or reawaken red tide.

161.    At concentrations of >100,000 cells/liter, the brevetoxins produced by red tide can and have killed Florida marine animals, including fish, sea turtles, manatees, sea birds, and dolphins.

162.    Brevetoxins from red tide have long been known to cause manatee mortality.

163.    Other studies have found markedly less shrimp and fish activity during red tide.

164.    The 2017-2018 red tide event reached the Florida panhandle in Okaloosa, Walton, Bay, and Franklin counties, and wrapped around the southern tip of Florida and up the Atlantic coast.

165.    By October 2018, red tide closed beaches in Pinellas, Manatee, Sarasota, Lee, Collier, Escambia, Okaloosa, Brevard, and Indian River counties. Concentrations of more than 1 million *K. brevis* cells/liter were observed in Pinellas, Hillsborough, Manatee, and Sarasota counties by November 2018.

166.    Governor Scott declared a state of emergency, and thousands of tons marine life killed by the bloom were removed, costing tax-payers millions of dollars.

***Harmful Algal Blooms Kill and Injure Endangered and Threatened Species***

167.    Red tide and blue-green algae blooms have individually, collectively, and synergistically killed tens of thousands of tons of marine wildlife, including ESA-listed species like sea turtles, Florida manatees, smalltooth sawfish, and coral.

Sea turtles

168.    FWS and NMFS have designated the leatherback, Kemp's ridley, and hawksbill sea turtles as endangered under the ESA, and the Northwest Atlantic Ocean Distinct Population Segments of loggerhead and green sea turtles as threatened under the ESA.

169.    These sea turtles use waters impacted by the Corps' Lake Okeechobee discharges and the harmful algal blooms.

170.    The southeastern United States has the world's largest number of loggerhead nests, with 90% of nesting in Florida. The majority of this nesting occurs in Brevard, Indian River, St. Lucie, Martin, and Palm Beach counties. Loggerhead sea turtles consistently aggregate in Indian River Lagoon.

171.    The second largest aggregation of green sea turtle nesting is in Florida.

172.    Florida is the only state in the continental U.S. where leatherbacks regularly nest.

173.    On July 10, 2014, FWS and NMFS designated critical habitat for the Northwest Atlantic Ocean Distinct Population Segment of the loggerhead sea turtle (*Caretta caretta*). The critical habitat designations include areas impacted by the Corps' discharges, the blue-green algae, and the red tide.

174.    The Florida Fish and Wildlife Conservation Commission (FWC) believes sea turtle mortality due to brevetoxicosis typically begins to occur in red tide with concentrations of *Karenia brevis* of at least 100,000 cells/liter.

175.    It is believed that red tide exposure may pose significant implications for immune function in loggerhead sea turtles.

176.    From Nov. 2017 through Dec. 10, 2018, FWC documented 1,260 stranded sea turtles, with 577 (250 loggerheads, 263 Kemp's ridleys, and 64 green sea turtles) due to red tide, making it the largest number of stranded sea turtles attributed to red tide on record.4

177.    These strandings occurred in Collier, Lee, Charlotte, Sarasota, Manatee, Hillsborough, and Pinellas counties.

178.    The Corps, FWS, and NMFS have not consulted under the ESA on the direct, indirect, and cumulative effect of harmful algal blooms on listed sea turtles.

Florida manatee

179.    FWS downlisted the Florida manatee from an endangered to a threatened species under the ESA in 2017.

180.    Florida manatees use most Florida freshwater systems accessible by the coasts, including the Caloosahatchee and St. Lucie rivers and estuaries, and Lake Okeechobee.

181.    The Florida manatee's critical habitat is impacted by the harmful algal blooms.

182.    Red tide can cause direct mortality of manatees and can also cause sublethal impacts. FWC reports that red tide contributed to the deaths of 224 Florida manatees January-December 31, 2018.

183.    The brevetoxin binds to manatees' brains, leading to edema and hemorrhaging, and ultimately, death.

184.    The Corps and FWS have not consulted under the ESA on the direct, indirect, and cumulative effects of harmful algal blooms on Florida manatees.

Smalltooth sawfish

185.    Smalltooth sawfish is a tropical marine and estuarine fish that was once common in waters throughout Florida and other states in the Southeast. In 2003, NMFS listed the United States population as an endangered distinct population segment under the ESA.

---

4 A stranded sea turtle is one that is dead, injured, or exhibits any indication of ill health or abnormal behavior.

186.    Currently, sawfish can only be found with any regularity in South Florida between the Caloosahatchee River and the Keys, and occasionally in the St. Lucie River. It is believed that the population is at a level less than five percent of its size at the time of European settlement.

187.    While it is unclear what the precise impacts to smalltooth sawfish and their habitat are from the discharges, freshwater flows influence the movement and distribution of smalltooth sawfish, which have an affinity for salinities between 18 and 24 psu (practical salinity unit).

188.    One of the three main objectives of the 2009 Smalltooth Sawfish Recovery Plan is to protect and/or restore sawfish habitats. One of the criteria that must be met for both the downlisting and delisting of the species states "freshwater flow regimes (including timing, distribution, quality, and quantity)...are appropriate to ensure natural behavior (e.g., feeding, resting, and predator avoidance) by maintaining salinities within preferred physiological limits of juvenile smalltooth sawfish."

189.    The Recovery Plan further calls for NMFS to "minimize the disruption of natural/historic freshwater flow regimes (including timing, quality, and quantity) and maintain or restore water quality to restore the long-term viability of the smalltooth sawfish."

190.    The Corps and NMFS have not consulted under the ESA on the direct, indirect, and cumulative effects of harmful algal blooms on smalltooth sawfish.

Coral

191.    NMFS has designated boulder star coral (*Montastraea annularis*), elkhorn coral (*Acropora palmata*), and staghorn coral (*Acropora cervicornis*) as threatened under the ESA. These coral were once the most abundant and important reef building corals of Florida and the greater Caribbean. They occur in United States waters off the coasts of Florida, Puerto Rico, the U.S. Virgin Islands, and Navassa Island.

192.    Over just the last 30 years, these species have suffered an 80-98 percent decline throughout significant portions of their range, reducing coral cover and opening space on reefs at an unprecedented pace.

193.    Habitat degradation and modification is a primary threat to these coral. Coral have suffered severe bleaching and mortalities due to increases in water temperature. The increasing acidity of seawater due to the oceans' uptake of carbon dioxide is also known to reduce the growth rate of corals and to impair the ability of elkhorn corals to populate a reef. These corals are also threatened by pollution and sedimentation, which further contributes to algae overgrowth of corals. Other threats include abrasion and breakage from contact with boats, anchors, and storms. Disease and predation also contribute to the decline of the corals.

194.    Black band disease of coral is a cyanobacteria-obligate disease that leads to extensive reef deterioration. Coastal pollution, cyanobacteria, and black band disease have impacted coral like the federally-threatened boulder star coral (*Montastraea annularis*). Studies of coral impacted by black band disease off the coast of Florida tested positive for the cyanotoxin *microcystin*.

195.    The Corps and NMFS have not consulted under the ESA on the direct, indirect, and cumulative effects of harmful algal blooms on coral.

***Climate change***

196.    Climate change is likely contributing to the growth of HAB. Favorable conditions for blooms include warm waters, changes in salinity, increases in atmospheric carbon dioxide concentrations, changes in rainfall patterns intensify coastal upwelling, sea level rise, and high nutrient levels.

197.    Climate scientists believe that there are significant differences in Lake Okeechobee inflows between dry phases and wet phases. The dry phase, which lasted from about 1965 to 1994, has shifted to a wet phase, which means that nearly the entire period of record used by the Corps for evaluation of the LORS does not represent the wet phase it is currently operating in.

198.    There is evidence that during the previous wet period from around 1930 to 1964, the inflows to the lake were about double as compared to the dry period of 1965 to 1994. It is likely that climate-driven increases in inflows from human-altered watersheds will increase the prevalence of harmful algal blooms.

### E.     Past Environmental Review of LORS

***2007 Supplemental Environmental Impact Statement for LORS***

199.     The Corps completed its analysis of LORS with its 2007 Supplemental Environmental Impacts Statement (SEIS).

200.     On page 111 of the SEIS, the Corps briefly mentions algae, noting that "a small percentage of algae produce toxins, and are termed HAB [harmful algae blooms]," but that even non-toxic algae can have harmful effects on marine ecosystems when masses of algae die and decompose, depleting oxygen in the water.

201.     The Corps also states on pages 111-112 that cyanobacteria and red tide "have traditionally received the dubious distinction of constituting nuisance bloom populations or HAB," and acknowledges that "[p]opulation increased [sic] and other anthropogenic factors have led to significant nutrient enrichment of Florida coastal waters over the past several decades," yet summarily concludes that "[i]t is unlikely that discharges from Lake Okeechobee are a prerequisite for HAB [harmful algae blooms] formation."

202.     The Corps offers no further information or analysis on algae or its impacts to the human environment in the SEIS.

203.     The Corps has not supplemented its NEPA analysis since 2007.

***FWS 2007 Biological Opinion & NMFS Concurrence Letter***

204.     FWS and the Corps initiated formal consultation on LORS on July 3, 2006, and FWS issued a biological opinion on LORS October 15, 2007.

205.     On page one, the biological opinion described LORS as "operational changes to the water management infrastructure that discharges water from Lake Okeechobee to downstream systems (St. Lucie and Caloosahatchee estuaries, the Everglades Agricultural Area [EAA] and the Water Conservation Areas [WCAs])" and stated that LORS is "intended to be active for three years, until around 2010" when the Corps "will incorporate possible structural improvements along with benefits from initial components of the Comprehensive Everglades Restoration Plan (CERP)."

206.     The Corps determined that LORS would not affect the eastern indigo snake, bald eagle, Cape Sable seaside sparrow, or West Indian manatee (also known as the Florida

manatee), and that it may affect the wood stork, Okeechobee gourd, and Everglades snail kite. FWS agreed that LORS would not affect the eastern indigo snake, bald eagle, or Cape Sable seaside sparrow; and that it may affect but was not likely to adversely affect the wood stork and Okeechobee gourd. FWS determined that LORS may affect but is not likely to adversely affect the West Indian manatee. As a result, FWS limited the action area for formal consultation to the range of the snail kite, which does not include the Caloosahatchee Estuary; therefore, the 2007 biological opinion did not analyze impacts to listed species in the estuary.

207.    FWS did not analyze the impacts of harmful algal blooms on any listed species in its 2007 biological opinion.

208.    Meanwhile, on September 11, 2007, NMFS issued the Corps a letter concurring with the Corps' determination that LORS was not likely to adversely affect smalltooth sawfish and Johnson's seagrass. NMFS based its concurrence on the Corps' draft SEIS which the Corps intended to function as its biological assessment. NMFS and the Corps determined that LORS would have no effect on five listed sea turtle species. The concurrence letter does not mention coral at all.

209.    NMFS and the Corps concluded that the project may affect but was not likely to adversely affect the smalltooth sawfish.

210.    NMFS did not analyze the impact of harmful algal blooms on any listed species in its 2007 concurrence letter.

***NMFS 2015 Concurrence Letter***

211.    On September 9, 2009, after the Corps completed its NEPA analysis and formal consultation with NMFS on LORS, NMFS designated critical habitat for the smalltooth sawfish, including portions of the Caloosahatchee River and Estuary.

212.    The Corps and NMFS reinitiated formal consultation on the smalltooth sawfish critical habitat and on May 14, 2015, NMFS issued a letter to the Corps concurring with its determination that LORS was not likely to adversely affect smalltooth sawfish or Johnson's seagrass, or destroy or adversely modify their habitat. The agencies reinitiated formal consultation due to the availability of new information regarding the smalltooth

sawfish and the designation of smalltooth sawfish critical habitat. The concurrence letter describes the action area as Lake Okeechobee, the St. Lucie and Caloosahatchee estuaries, the Everglades Action Area, the northern Water Conservation Areas, and the Lake Worth Lagoon in Palm Beach County.

213.    NMFS did not analyze the impact of harmful algal blooms on any listed species in its 2015 concurrence letter.

***FWS 2018 Biological Opinion***

214.    The Corps reinitiated formal consultation on LORS in 2017 with FWS because the FWS 2007 biological opinion had used habitat as a surrogate for numerical take for the snail kite and new case law had crystalized the requirement that take of species be enumerated whenever possible.

215.    On June 4, 2018, FWS published its biological opinion which was based on the Corps' 2017 biological assessments (received July 19, 2017 and September 28, 2017), meetings, analysis of modeling output, and additional information.

216.    FWS agreed with the Corps' determination that LORS will not affect the Cape Sable seaside sparrow or its habitat, eastern indigo snake, Florida panther, or northern crested caracara. FWS agreed with the Corps' determination that LORS is not likely to adversely affect the Florida bonneted bat, wood stork, Okeechobee gourd, or West Indian manatee or its critical habitat. FWS concluded that LORS is likely to adversely affect the Everglade snail kite and its critical habitat.

217.    Page one of the 2018 biological opinion recognizes that LORS is an ongoing action, and found that "[t]he current version of the LORS is intended to remain in effect until about 2025." It noted that the LORS developed in 2007 was planned to be revised in 2010.

218.    On page four of the 2018 biological opinion, FWS limited its analysis of the impacts of LORS to "all water bodies that a snail kite may use during its lifetime" and therefore did not analyze impacts of the Corps' discharges to the Caloosahatchee River or Estuary.

219.    On page 27, the 2018 biological opinion mentions that "when herbivores consume hydrilla while this cyanobacteria and the neurotoxin are present, they can display loss of muscle control resulting in difficult flying, swimming, and eventual death."

220.    The 2018 biological opinion found that the phosphorous goal for the lake is 40 ppb, the concentration of total phosphorous in the lake nearly doubled from 49 parts per billion in 1973 to 98 ppb in 1984, and 118 ppb by 2016 with a five-year previous average of 117 ppb; and that higher concentrations of phosphorous also promote blooms of cyanobacteria.

221.    FWS concurred with the Corps' determination that LORS may affect but is not likely to adversely affect the manatee. The Corps noted that manatees live year-round in Lake Okeechobee where there have been 64 manatee deaths in the lake from 2000 to 2012.

222.    The 2018 biological opinion did not discuss manatee deaths in the estuaries that may be linked to lake discharges.

223.    The 2018 biological opinion found that submerged aquatic vegetation or seagrasses for foraging, shallow areas for resting and calving, channels for travel and migration, warm-water refuges, and fresh drinking water are essential habitat features, and that while no designated manatee critical habitat occurs within the proposed project area (a departure from FWS' 2007 biological opinion), LORS has the potential to beneficially or adversely affect salinity conditions in the estuaries/rivers and therefore manatee forage.

224.    The 2018 biological opinion otherwise does not analyze impacts of harmful algal blooms on listed species.

***Conservation Organizations' Notice of Intent to Sue and Federal Agencies' Reply***

225.    On December 19, 2018, Conservation Organizations notified the Corps, FWS, and NMFS of their intent to sue the agencies over violations of the Endangered Species Act regarding LORS.

226.    The 40-page notice letter included scientific information from over 170 scientific journal articles, agency reports, and news articles on the impacts of harmful algal blooms,

including their impacts on listed species and the effect of climate change on harmful algal blooms.

227.     On March 21, 2019, the Corps, FWS, and NMFS responded to the Conservation Organizations' notice letter and stated that the Corps will "at a minimum, engage in informal consultation" with both FWS and NMFS.[5]

228.     The March 21 letter enclosed a letter to FWS and a letter to NMFS, both also dated March 21, 2019.

229.     The Corps' letter to FWS explained that "The Corps does not have any information suggesting any [reinitiation criteria] have been met, but is aware that there are concerns regarding the relationship between LORS 2008, harmful algal blooms, and listed species."

230.     The Corps' letter to FWS requested "informal consultation" to "coordinate on any new information that could relate to LORS effects."

231.     The Corps' letter to FWS did not include any of the science provided in the notice letter.

232.     The Corps' letter to NMFS explained that the Corps "believes new species have been listed that have not been addressed in the Corps' consultation record with NMFS with regard to the LORS 2008" including the boulder star coral (*Orbicella franski*), lobed star (*Orbicella annularis*), elkhorn coral (*Acropora palmata*), staghorn coral (*Acropora cervicornis*), rough cactus coral (*Mycetophyllia ferox*), and Nassau grouper (*Epinephelus striatus*).

233.     The Corps' letter to NMFS requested "informal consultation."

234.     The Corps' letter to NMFS did not include any of the science provided in the notice letter.

235.     Upon information and belief, the Corps, FWS, and NMFS have not initiated formal consultation.

---

[5] Exhibit 2 – Letter from Office of Counsel for the Department of the Army to Conservation Organizations, Mar. 21, 2019.

236.   Upon information and belief, the Corps, FWS, and NMFS have not otherwise addressed the violations alleged in the December 19, 2018 notice letter.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Corps' Violations of the National Environmental Policy Act)**

237.   Conservation Organizations re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

238.   The Corps continues to perform a major federal action for the purpose of NEPA by operating LORS. *See* 42 U.S.C. § 4332(2)(C).

239.   If after preparing an EIS, "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," the agency must prepare supplemental NEPA review analyzing the environmental implications of the changes. 40 C.F.R. § 1502.9(c).

240.   The Corps' failure to supplement its LORS NEPA analysis violates NEPA and the APA by:

    (a)    Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of LORS, including by failing to assess the environmental impacts of harmful algal blooms on the public health or safety;

    (b)    Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of LORS, including by failing to assess the environmental impacts of harmful algal blooms to listed species in the regions affected by Lake Okeechobee discharges;

    (c)    Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of LORS, including by failing to assess the environmental impacts of harmful algal blooms on national wildlife refuges and state aquatic preserves affected by Lake Okeechobee discharges;

(d)    Failing to supplement its NEPA review with significant new information relevant to environmental concerns and bearing on the continued action and its impacts as it relates to harmful algal blooms, public health and safety, federally-listed sea turtles, the Florida manatee, smalltooth sawfish, and corals;

(e)    Failing to supplement its NEPA review with significant new information regarding the impact of climate change and toxic algae including the increasing rates of cyanobacteria in Lake Okeechobee and the bodies of water affected downstream by LORS releases, and their synergistic effects with red tide; and

(f)    Failing to supplement its NEPA review with significant new information regarding its intention to operate under LORS until at least 2022.

241.    The Corps' failure to prepare a supplemental EIS is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

242.    The Corps' failure to uphold its obligations under the NEPA have caused and will continue to cause Conservation Organizations' injuries as described in above.

## SECOND CLAIM FOR RELIEF

**(The Failure of the Corps, FWS, and NMFS to Reinitiate Formal Consultation on the 2018 Biological Opinion and 2015 Concurrence Letter Violate the Endangered Species Act)**

243.    Conservation Organizations re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

244.    Federal agencies must reinitiate formal consultation if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," 50 C.F.R. § 402.16(b), or if "the amount or extent of taking specified in the incidental take statement is exceeded." *Id.* § 402.16(a).

245.    There have been several sustained summers of blue-green algae and red tide which have harmed sea turtles, manatees, smalltooth sawfish, and boulder star, elkhorn, and staghorn coral since the Corps implemented LORS.

246.    To date, the Corps, FWS, and NMFS have not consulted on the impacts of harmful algal blooms on listed species.

247.    There is mounting science suggesting that Lake Okeechobee discharges are feeding the harmful algal blooms which are in turn taking listed species.

248.    To date, FWS and NMFS have not authorized take of listed species attributable to harmful algal blooms.

249.    The Corps, FWS, and NMFS must reinitiate formal consultation based on this new information that reveals that LORS may be causing or contributing to harmful algal blooms which are taking listed species.

250.    Every take of sea turtles, Florida manatee, smalltooth sawfish, and coral and their habitat that occurs due to LORS is unauthorized.

251.    Federal agencies must also reinitiate formal consultation "if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." *Id*. § 402.16(d).

252.    By all accounts, LORS was to commence in 2008 and conclude, or at the very least, be revisited by the Corps in 2010. The extension of LORS past the planned 2010 termination date constitutes a significant project modification that could have significant long-term implications to the survival and recovery of protected species. Accordingly, the Corps must reinitiate formal consultation with NMFS to analyze the potential long-term and permanent impacts the ongoing implementation of LORS is having on federally-listed marine and estuarine species.

253.    The Corps', NMFS', and FWS' failures to reinitiate formal consultation have caused and will continue to cause Conservation Organizations' injuries as described in above.

## THIRD CLAIM FOR RELIEF

### (FWS' Issuance of and the Corps' Reliance upon FWS' 2018 Biological Opinion is Arbitrary and Capricious and Violates the Endangered Species Act and the Administrative Procedure Act)

254.    Conservation Organizations re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

255.    Water from Lake Okeechobee has a profound impact on the estuarine and coastal ecosystem. In times of drought, the Corps deprives the Caloosahatchee River of lake water and the system becomes more saline, in times of high water, the estuaries are blasted with nutrient-rich water which may be fueling nearshore red tide.

256.    FWS' 2018 biological opinion is arbitrary and capricious and violates the ESA, 16 U.S.C. § 1536, and the APA, 5 U.S.C. § 706, for a number of reasons, including but not limited to:

> (a)    FWS failed to consider the entire scope of LORS, including all direct, indirect, and cumulative impacts. For example, FWS failed to explicitly analyze the impacts of continuing LORS into 2025,[6] it did not capture the entire scope and duration of the agency action, and it did not analyze the impact of harmful algal blooms on Florida manatee and other listed species.

> (b)    FWS failed to articulate a rational connection between the facts found and the choice made of listed species, especially those that were expected to exhibit "avoidance behavior" as a result of LORS. FWS has not explained why avoidance behaviors exhibited by Florida manatees would not increase the likelihood of take, or how LORS is not likely to adversely

---

6 In consulting on the 2018 biological opinion, the Corps anticipated the Herbert Hoover Dike repairs to be completed in 2025. Subsequent to the 2018 biological opinion, the Corps announced it anticipated the Herbert Hoover Dike repairs would be completed in 2022.

affect any listed species, despite the resulting and acknowledged "avoidance behaviors" of listed species.

(c)    FWS failed to consider or address the potential impacts of LORS on the recovery of affected listed species.

(d)    FWS failed to consider the effects of climate change, specifically as they relate to precipitation and contributions to harmful algal blooms.

(e)    FWS improperly limited the "action area" for purposes of its ESA analysis to the lake and not the rivers and estuaries that receive the lake's discharges and therefore failed to analyze impacts to the Florida manatee and its habitat.

257.    The Corps has an independent, substantive duty under Section 7 of the ESA to ensure that its actions are not likely to jeopardize listed species or adversely modify their critical habitat. FWS' 2018 biological opinion on LORS violates the ESA and APA and is unlawful; therefore, the Corps' reliance on FWS' 2018 biological opinion to fulfill its Section 7 procedural and substantive duties is also arbitrary and capricious, and violates the ESA.

258.    Without a valid biological opinion from FWS, the Corps does not have incidental take authorization, and therefore, the Corps' actions under LORS violate Section 9 of the ESA by causing unauthorized take.

259.    FWS' 2018 Biological Opinion and the Corps' subsequent reliance on it was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

260.    The Corps' and FWS' violations have caused and will continue to cause Conservation Organizations' injuries as described in above.

## FOURTH CLAIM FOR RELIEF

## (NMFS' Issuance of and the Corps' Reliance Upon NMFS' 2015 Concurrence Letter Regarding LORS is Arbitrary and Capricious and Violates the Endangered Species Act and the Administrative Procedure Act)

261.    Conservation Organizations re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth herein.

262.    NMFS' 2015 concurrence letter is arbitrary and capricious and violates the ESA, 16 U.S.C. § 1536, and the Administrative Procedure Act (APA), 5 U.S.C. § 706, for a number of reasons, including but not limited to:

(a)    NMFS failed to consider the entire scope of LORS, including all direct, indirect, and cumulative impacts. For example, NMFS failed to explicitly analyze the impacts of continuing LORS beyond 2010.

(b)    NMFS failed to articulate a rational connection between the facts found and the choice made for listed species, especially those that were expected to exhibit "avoidance behavior" as a result of LORS. NMFS has not explained why avoidance behaviors would not increase the likelihood of take, or how LORS is not likely to adversely affect any listed species, despite the resulting and acknowledged "avoidance behaviors" of listed species;

(c)    NMFS entirely failed to consider impacts of the discharges, blue-green algae, and red tide on sea turtles, smalltooth sawfish, Johnson's seagrass, boulder star, elkhorn, and staghorn coral, and their critical habitat;

(d)    NMFS failed to consider or address the potential impacts of LORS on the recovery of affected listed species;

(e)    NMFS completely failed to analyze the effects of climate change on LORS and listed species, including impacts like red tide.

263.    The Corps has an independent, substantive duty under Section 7 of the ESA to ensure that its actions are not likely to jeopardize listed species or adversely modify their critical habitat. NMFS' 2015 concurrence letter on LORS violates the ESA and APA and

is unlawful; therefore, the Corps' reliance on NMFS' concurrence letter to fulfill its Section 7 procedural and substantive violations is also arbitrary and capricious, and violates the ESA. Furthermore, without a biological opinion from NMFS and accompanying "incidental take statement" including "reasonable and prudent measures" and "terms and conditions" to minimize impacts and incidental take, the Corps does not have incidental take authorization, and therefore, the Corps' actions under LORS violate Section 9 of the ESA by causing unauthorized take.

264.    NMFS' 2015 concurrence letter and the Corps' subsequent reliance on it was arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the law.

265.    The Corps' and NMFS' violations have caused and will continue to cause Conservation Organizations' injuries as described in above.

## FIFTH CLAIM FOR RELIEF

### (The Corps' Violation of the Endangered Species Act Regarding its Section 7(a)(1) Obligations)

266.    Conservation Organizations re-allege and incorporate by reference all the allegations set forth in this Complaint, as though fully set forth below.

267.    The Corps is in violation of Section 7(a)(1) of the ESA by failing to utilize its authorities regarding LORS in furtherance of the purposes of the statute.

268.    Section 7(a)(1) of the ESA imposes an obligation on all federal agencies, in consultation with the FWS and NMFS, to "carry[] out programs for the conservation" of listed species. 16 U.S.C. § 1536(a)(1).

269.    This provision imposes an affirmative duty on the Corps to conserve species it is currently harming with LORS.

270.    Conserve, in the context of the ESA, means the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures" provided by the ESA "are no longer necessary." *Id*. § 1532(3).

271.    The Corps has violated this affirmative obligation by carrying out a program –
LORS – that has had the opposite effect of conserving species.

272.    Because the Corps has failed to offset the harm caused by LORS to species and
their habitat, the Corps has violated and continues to violate Section 7(a)(1) of the ESA.

273.    The Corps' failure to uphold its obligations under the ESA have caused and will
continue to cause Conservation Organizations' injuries as described above.

## VII. PRAYER FOR RELIEF

WHEREFORE, Conservation Organizations request that the Court enter
Judgment for Conservation Organizations and provide the following relief:

(1)    Declare that the Corps' failure to supplement its NEPA analysis on LORS
is arbitrary, capricious, and contrary to the consultation requirements of
NEPA, and in violation of the APA, 5 U.S.C. § 706(2)(A);

(2)    Declare that the Corps' failure to reinitiate formal consultation with FWS
and NMFS is arbitrary, capricious, and not in accordance with the
requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. §
402.16, and in violation of the APA, 5 U.S.C. § 706(2)(A);

(3)    Declare that the FWS' issuance of and the Corps' reliance upon FWS'
2018 biological opinion is arbitrary, capricious, and contrary to the
consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2),
50 C.F.R. § 402.14, and in violation of the APA, 5 U.S.C. § 706(2)(A);

(4)    Declare that the NMFS' issuance of and the Corps' reliance upon NMFS'
2015 concurrence letter is arbitrary, capricious, and contrary to the
consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2),
50 C.F.R. § 402.14, and in violation of the APA, 5 U.S.C. § 706(2)(A);

(5)    Order the Corps to supplement its NEPA analysis on LORS;

(6)    Order the Corps to initiate formal consultation with FWS and NMFS;

(7)    Order FWS to withdraw its 2018 biological opinion;

(8)    Order NMFS to withdraw the 2015 concurrence letter;

(9)     Preliminarily and permanently enjoin the Corps from authorizing any further releases from Lake Okeechobee under LORS until the Corps fully complies with the requirements of NEPA, the ESA, and the APA;

(10)    Award Conservation Organizations their costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, Fed. R. Civ. P. 54(d), and the ESA, 16 U.S.C. § 1540(g)(4); and

(11)    Award Conservation Organizations any other relief that is just and proper.

**DATED:**  June 11, 2019.

Respectfully submitted,

*Jaclyn Lopez*
JACLYN LOPEZ, Trial Counsel
FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
jlopez@biologicaldiversity.org

*Jason Totoiu*
JASON TOTOIU
FL Bar No. 871931
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (561) 568-6740
jtotoiu@biologicaldiversity.org