UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. PIERCE DIVISION

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; CALUSA WATERKEEPER; and WATERKEEPER ALLIANCE, | ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO.: 2:19-cv-14199-DMM |
| v. | ) ) | |
| U.S. ARMY CORPS OF ENGINEERS; COL. ANDREW KELLY, in his official capacity as Commander and District Engineer of the U.S. Army Corps of Engineers; U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of Interior; NATIONAL MARINE FISHERIES SERVICE; DR. ROY E. CRABTREE, in his official capacity as Regional Administrator of the Southeast Regional Office of National Marine Fisheries Service; U.S. FISH AND WILDLIFE SERVICE; and AURELIA SKIPWITH,[1] in her official capacity as Director of U.S. Fish and Wildlife Service, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Federal Defendants. | ) | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT**

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Aurelia Skipwith, in her official capacity as Director of the U.S. Fish and Wildlife Service, is automatically substituted for Margaret Everson.

i

## TABLE OF CONTENTS

REQUEST FOR HEARING....................................................................................................... xi

MOTION FOR PARTIAL SUMMARY JUDGMENT..................................................................... 1

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ........................................................................................................... 1

    LEGAL FRAMEWORK ........................................................................................................ 3

    I.    Endangered Species Act ........................................................................................... 3

    II.   Standard of Review .................................................................................................. 5

    ARGUMENT ......................................................................................................................... 6

    I.    FWS' 2018 Biological Opinion and the Corps' Reliance Upon It is Arbitrary and
        Capricious. ............................................................................................................... 7

        A.    FWS' 2018 Biological Opinion is Unlawful Because Its Environmental Baseline
            Does Not Incorporate Harm from Harmful Algal Blooms ................................... 8

        B.    The 2018 Biological Opinion is Unlawful Because FWS Improperly Limits the
            "Action Area" ...................................................................................................... 11

        C.    The 2018 Biological Opinion is Unlawful Because It Fails to Consider or
            Address Impacts of LORS on the Recovery of Listed Species ........................ 12

        D.    The Corps Has Not Satisfied Its Independent Duty to Ensure Against
            Jeopardy .............................................................................................................. 12

    II.   The Agencies' Refusal to Reinitiate Formal Consultation Violates the Endangered
        Species Act............................................................................................................. 13

        A.    The Agencies Must Reinitiate Formal Consultation Because "New Information"
            Reveals Effects of LORS that May Affect Listed Species or Critical Habitat in a
            Manner or to an Extent Not Previously Considered ......................................... 13

            1.    The Record Shows LORS is Contributing to Blue-Green Algae Blooms
                Which May Affect Listed Species in a Manner Not Previously
                Considered ................................................................................................ 14

            2.    The Record Shows LORS is Contributing to Red Tide Blooms, Which
                 May Affect Listed Species in a Manner Not Previously Considered ........ 15

        B.    The Agencies Must Reinitiate Formal Consultation Because the Corps is
            Exceeding Take From the 2018 Biological Opinion ......................................... 18

    III.  The Corps Has Failed to Utilize Its Authorities in Furtherance of the Endangered
        Species Act............................................................................................................. 18

    IV.  The Conservation Organizations Have Standing....................................................... 20

    CONCLUSION.................................................................................................................... 20

## TABLE OF CITATIONS AND AUTHORITIES

Cases

*Ala.-Tombigbee Rivers Coal. v. Kempthorne,*
  477 F.3d 1250 (11th Cir. 2007) ................................................................... 14

*Ariz. Cattle Growers Ass'n v. Salazar,*
  606 F.3d 1160 (9th Cir. 2010) .................................................................... 18

*Bldg. Indus. Ass'n v. Norton,*
  247 F.3d 1241 (D.C. Cir. 2001) ................................................................. 18

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1988) .......................................................... 10, 11, 15

*Ctr. for Biological Diversity v. Salazar,*
  804 F. Supp. 2d 987 (D. Ariz. 2011) .......................................................... 12

*Defs. of Wildlife v. Babbitt,*
  130 F. Supp. 2d 121 (D.D.C. 2001). .......................................................... 11

*Defs. of Wildlife v. Babbitt,*
  958 F. Supp. 670 (D.D.C. 1997) ................................................................ 17

*Dow AgroScience LLC v. Nat'l Marine Fisheries Serv.,*
  707 F.3d 462 (4th Cir. 2013) ..................................................................... 10

*Fla. Key Deer v. Brown,*
  364 F. Supp. 2d 1345 (S.D. Fla. 2005) ................................................ 4, 6, 8, 13, 19

*Fla. Key Deer v. Paulison,*
  522 F.3d 1133 (11th Cir. 2008) ............................................................. 19, 20

*Fla. Key Deer v. Stickney,*
  864 F. Supp. 1222 (S.D. Fla. 1994) ....................................................... 15, 17

*Greenpeace v. Nat'l Marine Fisheries Serv.,*
  80 F. Supp. 2d 1137 (W.D. Wash. 2000) .................................................... 10

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.,*
  230 F. Supp. 3d 1106 (N.D. Cal. 2017) ........................................................ 5

*Miccosukee Tribe of Indians v. United States,*
  566 F.3d 1257 (11th Cir. 2009) ................................................................... 7

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................... 5, 6, 17

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  524 F.3d 917 (9th Cir. 2008) .................................................................. 8, 12

*Native Ecosystems Council v. Dombeck,*
  304 F.3d 886 (9th Cir. 2002) ..................................................................... 11

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
  475 F.3d 1136 (9th Cir. 2007) .................................................................... 18

*Ouachita Watch League v. Jacobs,*
  463 F.3d 1163 (11th Cir. 2006) ................................................................... 5

*Pac. Coast Fed'n of Fisherman's Ass'ns v. U.S. Bureau of Reclamation,*
  426 F.3d 1082 (9th Cir. 2005) .................................................................... 15

*Sierra Club v. Babbitt,*
  15 F. Supp. 2d 1274 (S.D. Ala. 1998) .......................................................... 10

iii

*Sierra Club v. Glickman*,
  156 F.3d 606 (5th Cir. 1998) ................................................................. 20
*Sierra Club v. Martin*,
  168 F.3d 1 (11th Cir. 1999) ..................................................................... 6
*Simmons v. Block*,
  782 F.2d 1545 (11th Cir. 1986) ............................................................... 6
*Sw. Ctr. for Biological Diversity v. Babbitt*,
  215 F.3d 58 (D.C. Cir. 2000) ................................................................. 18
*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ...................................................................... 3, 7, 20


Statutes

5 U.S.C. § 704 ............................................................................................... 5
5 U.S.C. § 706(2)(A) ..................................................................................... 5
16 U.S.C. § 1532(3) .......................................................................... 5, 12, 19
16 U.S.C. § 1536(a)(1) ............................................................................ 5, 18
16 U.S.C. § 1536(a)(2) ................................................................ 4, 8, 10, 12
16 U.S.C. § 1536(b) ...................................................................................... 4
16 U.S.C. § 1536(b)(4) ............................................................................... 13
16 U.S.C. § 1536(b)(4)(C) ............................................................................ 5
16 U.S.C. § 1536(c)(1) .................................................................................. 4
16 U.S.C. § 1538 ......................................................................................... 13


Regulations

50 C.F.R. § 17.3 ..................................................................................... 4, 14
50 C.F.R. § 402.02 ...................................................................... 3, 4, 11, 12
50 C.F.R. § 402.12 ........................................................................................ 4
50 C.F.R. § 402.12(g) ................................................................................... 4
50 C.F.R. § 402.14 ........................................................................................ 4
50 C.F.R. § 402.14(a) .................................................................................... 4
50 C.F.R. § 402.14(g)(1)–(4) ........................................................................ 4
50 C.F.R. § 402.14(g)(3) ........................................................................... 8, 9
50 C.F.R. § 402.14(g)(8) ............................................................................... 8
50 C.F.R. § 402.14(i) ..................................................................................... 5
50 C.F.R. § 402.14(i)(1) ................................................................................ 4
50 C.F.R. § 402.15(a) .................................................................................... 5
50 C.F.R. § 402.16 ........................................................................................ 5
50 C.F.R. § 402.16(a) .................................................................................. 18


Rules

Fed. R. Civ. P. 56(a) ..................................................................................... 6

iv

Other Authorities

51 Fed. Reg. 19,926 (June 3, 1986) .............................................................................................. 4

H.R. Rep. No. 96–697 (1979) ........................................................................................................ 7

## TABLE OF ADMINISTRATIVE RECORD CITATIONS

| Agency Document | AR Document Number | Bates Page Number(s) | Motion Page Number(s) |
|---|---|---|---|
| 19980300 Bossart et al. 1998_brevetoxicosis in manatees | USACE Doc. No. 2 | 000004-000010 | 16 |
| 19990702 Trainer, High Affinity binding of red tide neurotoxins to marine mammal brain | USACE Doc. No. 5 | 000048-000057 | 16 |
| 20010515 Enfield, The Atlantic multidecadal oscillation and its relation to rainfall and river lows in the continental US | USACE Doc. No. 8 | 000173-000176 | 11 |
| 20020200 Kirkpatrick 2002_Florida Red Tides Manatee brevetoxicosis and lung models | USACE Doc. No. 12 | 000265-000273 | 16 |
| 20020300 Kreuder et al -Clinicopathologic Features of Suspected Brevetoxicosis in Double-Crested Cormorants (Phalacrocorax auritus) along the Florida Gulf Coast | USACE Doc. No. 13 | 000274-000282 | 16 |
| 20050609 Flewelling 2005_marinemammals_redtide | USACE Doc. No. 23 | 000372-000377 | 16 |
| 20060630 USACE Biological Assessment for FWS - LORS 2008 ESA Consultation | USACE Doc. No. 38 | 000472-000487 | 11 |
| 20070000 Brand, Long-term increase in Karenia Brevis abundance along the southwest florida coast | USACE Doc. No. 48 | 000664–000695 | 15 |
| 20071015 FWS Biological Opinion to USACE - LORS ESA Consultation | USACE Doc. No. 64 | 000930–001009 | 3, 6, 7 |
| 20071100 USACE Final Supplemental Environmental Impact Statement RE LORS | USACE Doc. No. 65 | 001010-001830 | 2, 7 |
| 20080500 Paerl, Blooms like it hot | USACE Doc. No. 71 | 002574-002576 | 11 |
| 20081216 Olascoaga,MJ_Tracing the early development of harmful algal blooms on the West Florida shelf | USACE Doc. No. 78 | 002690–002699 | 2, 16 |
| 20090000 Landsberg, Karenia brevis red tides, brevetoxins in the food web and impacts on natural resources | USACE Doc. No. 80 | 002705-002714 | 16 |
| 20090100 Butler et al. California EPA - Microcystins a brief overview of their toxicity | USACE Doc. No. 84 | 002834-002854 | 14 |
| 20090200 Paerl, Climate Change- A catalyst for global expansion of harmful cyanobacterial blooms | USACE Doc. No. 86 | 002878-002889 | 11 |
| 20091125 Brand, LR 2009. Human exposure to cyanobacteria and BMAA | USACE Doc. No. 94 | 003004-003015 | 2, 14 |

| | | | |
|---|---|---|---|
| 20100725 Biefang, Prominent Human Health Impacts from Several Marine Microbes_History, Ecology, and Public Health Implications | USACE Doc. No. 132 | 003306-003321 | 2, 16 |
| 20100901 Brand et al_Cyanobacterial_blooms_and_the_occurrence of the neurotoxin BMAA in SFL aquatic food webs | USACE Doc. No. 139 | 003334-003349 | 2 14 |
| 20101000 - 57_DOI FWS - JN Ding Darling National Wildlife Refuge_2010 Comp Conservation Plan | USACE Doc. No. 143 | 003370-003760 | 1, 2, 17, 19 |
| 20101220 Banack, The Cyanobacteria Derived Toxin BetaNMethylaminoLAlanine and Amyotrophic Lateral Sclerosis | USACE Doc. No. 147 | 003825-003838 | 2, 14 |
| 20110000 Pierce, Compositional changes in neurotoxins and their oxidative derivatives from the dinoflagellate, karenia brevis, in seawater and marine aerosol | USACE Doc. No. 148 | 003839-003844 | 16 |
| 20110300 Garrett, M_Harmful algal bloom species and phosphate-processing effluent | USACE Doc. No. 159 | 003952-003957 | 2 |
| 20110620 Moss, Allied Attack-Climate Change and Eutrophication | USACE Doc. No. 172 | 003999-004003 | 11 |
| 20111123 Rzymski et al. 2011 Gastroenteritis and liver carcinogenesis induced by cyanobacterial toxins | USACE Doc. No. 179 | 004124-004127 | 14 |
| 20120115 Echevarria 2012_effects of karenia brevis on clearance rates and bioaccumulation of brevetoxins in benthic  invertebrates | USACE Doc. No. 181 | 004389-004398 | 16 |
| 20120301 Holtcamp, The emerging science of BMAA | USACE Doc. No. 184 | 004471-004477 | 2, 14 |
| 20120815 Twiner et al_2012_Comparative analysis of three brevetoxin-associated bottlenose_dolphin mortality events in the FL panhandle region | USACE Doc. No. 187 | 004505-004523 | 16 |
| 20130500 EPA, Impacts of Climate Change on the Occurrence of Harmful Algal Blooms | USACE Doc. No. 194 | 004592-004594 | 11 |
| 20131000 Castle 2013  Coyotes  Dogs  RedTide | USACE Doc. No. 196 | 004615-004625 | 16 |
| 20150429 Lake Okeechobee Algae Bloom Discussion and Recommendations | USACE Doc. No. 287 | 005613-005614 | 9 |
| 20150500 Algal Bloom FAQ May 2015c - Copy | USACE Doc. No. 289 | 005620-005624 | 9 |
| 20150600 Havens, Climate Change and the Occurrence of Harmful Microorganisms in Florida's ocean and coastal waters | USACE Doc. No. 299 | 005664-005669 | 11 |

| 20151014 Havens, Climate Change at a crossroad for control of harmful algal blooms | USACE Doc. No. 329 | 005884-005885 | 11 |
|---|---|---|---|
| 20151101 Wells, Harmful algal blooms and climate change- learning from the past and present to forecast the future | USACE Doc. No. 333 | 005898-005956 | 11 |
| 20160131_USACE_internal_RE_ Brain-tangling algae lurks in Florida waters (photo of green algae)  Conversation with Fl Dept of Health Staffer regarding latest study on BMAA (algal toxin | USACE Doc. No. 355 | 006343-006346 | 14 |
| 20160211_USACE_Internal_Red Tide Update FWC | USACE Doc. No. 360 | 006361-006363 | 9 |
| 20160211_USACE_RedTide_FW_ Environmental Impact Questions | USACE Doc. No. 361 | 006364-006364 | 9 |
| 20160600 Appendix_E_HHD_DSMS_FEIS_FWCA_E SA | USACE Doc. No. 385 | 006971-007085 | 1 |
| 20160815 USACE Biological Assessment for FWS RE LORS and PFP Complete Initiation Package | USACE Doc. No. 396 | 007348-007406 | 8 |
| 20161213 USACE Updated Biological Assessment on LORS and PFP in Response to FWS RAI | USACE Doc. No. 407 | 007653-007720 | 8 |
| 20170000 Manatee Critical Habitat Map | USACE Doc. No. 411 | 007763-007763 | 1 |
| 20170719_LORS_biological assessment | USACE Doc. No. 424 | 007956-008011 | 8 |
| 20170900 USACE LORS Biological Assessment for FWS Version 2 - LORS ESA Consultation | USACE Doc. No. 427 | 008022-008078 | 2, 8 |
| 20180000 FWC Green Turtle Nesting in Florida | USACE Doc. No. 431 | 008123-008124 | 2 |
| 20180000 Zhang J, Chapter 8B Lake Okeechobee Watershed Research and Water Quality Monitoring SFER vol1 | USACE Doc. No. 437 | 008194-008296 | 2, 9 |
| 20180200 Havens, The Future of Harmful Algal Blooms in Florida Inland and Coastal Waters | USACE Doc. No. 441 | 008569-008572 | 11 |
| 20180600 Gravinese 2018_effects of redtide  on StoneCrabs | USACE Doc. No. 445 | 009172-009175 | 16 |
| 20180604 FWS Biological Opinion to USACE with Appendices- LORS 2008 ESA Consultation | USACE Doc. No. 446 | 009176-009338 | 3, 6 |
| 20180716_USACE_Internal_LakeOflows_R E_ Red tide (UNCLASSIFIED) | USACE Doc. No. 448 | 009341-009341 | 10 |
| 20180831 Munoz, C_Scientists_Lake Okeechobee runoff may enhance red tide | USACE Doc. No. 452 | 009365-009366 | 16 |

| 20180927 _ Internal Email Red Tide Link to Lake O discharges | USACE Doc. No. 453 | 009367-009367 | 10 |
|---|---|---|---|
| 20181026 MFR - LORS AOF Justification and NEPA Coverage Determination | USACE Doc. No. 456 | 009377-009385 | 13 |
| 20181219 Letter from CBD to USACE FWS NMFS RE Notice of Intent to Sue LORS NOI | USACE Doc. No. 458 | 009389-009428 | 6 |
| 20190111 FWS Website_Florida Manatees and impacts of Blue-Green Algae Blooms_ North Florida ESO J | USACE Doc. No. 461 | 009452-009453 | 14 |
| 20190222 MFR - LORS AOF Justification and NEPA Coverage Determination | USACE Doc. No. 466 | 009462-009471 | 14 |
| 20190314_USACE_internal_HAB_Health_ RE_ LOSOM hearings  FWC August 2018 on manatee mortality question and answer paper  (UNCLASSIFIED)  Redacted | USACE Doc. No. 467 | 009472-009474 | 14 |
| 20190321 Letter from USACE to FWS Reinitiating Informal ESA Consultation | USACE Doc. No. 472 | 009530-009544 | 3, 6, 10, 16 |
| 20190322 Email from USACE to FWS Reinitiation of Informal ESA on LORS att 7a7d | USACE Doc. No. 478 | 009908-009918 | 13, 14, 15 |
| 20190602 Letter from FWS to USACE RE LORS ESA Consultation - Concurs with USACE effects determinations | USACE Doc. No. 487 | 010064-010065 | 3, 6, 13, 15, 17 |
| 20190806 Draft EA 2019 Planned Deviation to LORS | USACE Doc. No. 493 | 010148-010275 | 2, 3 |
| 20191025 Florida Red Tide FAQs _ Mote Marine Aquarium _ Mote Marine Laboratory & Aquarium | USACE Doc. No. 497 | 010291-010300 | 15 |
| 20081119_Paerl et al. HAB southwest coast and N and P | USACE Supp. Doc. No. 20 | 011454-011465 | 16 |
| 20130820 FOS 2013 Florida Oceanographic Society The Everglades & Northern Estuaries; St. Lucie River Estuary, Indian River Lagoon, & Caloosahatchee Estuary | USACE Supp. Doc. No. 39 | 012267-012309 | 18, 19 |
| 20140900 Heil 2014 Blooms of Karenia brevis | USACE Supp. Doc. No. 5 | 012527-012540 | 16 |
| 20170400 FTW 2017 Florida Tax Watch The Cost of Inaction on the Florida Everglades & Lake Okeechobee Water Crisis | USACE Supp. Doc. No. 59 | 012878-012901 | 2, 9 |
| 20180705 Corps letter to Mast 2018_07_05 | USACE Supp. Doc. No. 64 | 012976-012987 | 2, 18, 19 |
| 20180709 Krimsky 2018 A Response to FAQs about the 2018 Lake Okeechobee, Caloosahatchee and St. Lucie Rivers and Estuaries Algal Blooms | USACE Supp. Doc. No. 65 | 012988-012995 | 2, 10 |

| 20180918 Goforth 2018 A brief discussion of Lake Okeechobee Pollution - Draft Subject to Revision | USACE Supp. Doc. No. 67 | 013013-013033 | 2, 16 |
|---|---|---|---|
| 20181008 Jones 2018 Could toxic red tide move farther north to St Johns County - The St. Augustine Record | USACE Supp. Doc. No. 70 | 013055-013056 | 15 |
| 20181018 Murphy 2018 Red tide is spreading in Florida CNN | USACE Supp. Doc. No. 73 | 013063-013065 | 2, 10, 15 |
| 20181029 Hagan 2018 Red tide has contributed to the deaths of nearly 190 Florida manatees, FWC says ABCActionNews | USACE Supp. Doc. No. 74 | 013066-013067 | 15 |
| 20181101 Keieki 2018 Red tide update for Northwest Florida WPMI NBC15 | USACE Supp. Doc. No. 77 | 013074-013076 | 15 |
| 20181109 FWC 2018_11_09 Email from FWC RE Sea Turtle Strandings and Red Tide | USACE Supp. Doc. No. 79 | 013080-013083 | 16 |
| 20181203 SCCF 2018_12_04 memo to Corps PSC Caloosahatchee & Estuary Condition Report | USACE Supp. Doc. No. 81 | 013090-013092 | 2, 18 |
| 20181207 NOAA 2018 Bottlenose dolphin unusual mortality event southwest Florida | USACE Supp. Doc. No. 82 | 013093-013098 | 16 |
| 20181212 FWC 2018a Preliminary Red Tide Manatee Mortalities | USACE Supp. Doc. No. 83 | 013099-013103 | 15, 18 |
| 20190403 Attachment - Link - OurFloridaReefs_Map-Poster_ESA_2013-06-10_web | USACE Supp. Doc. No. 98 | 013241-013241 | 2 |
| Exhibit A: South Florida Water Management District, 2019. South Florida Environmental Report -Chapter 8C: St. Lucie and Caloosahatchee River Watersheds Annual Report | N/A | N/A | 10 |
| FWS Administrative Record | FWS Doc. Nos. 1-176 | 0100000–116582 | 17 |
| Florida manatee recovery plan | FWS Doc No. 58 | 0105712-0105905 | 1, 2 |
| Lake Okeechobee Regulation Schedule biological opinion | FWS Doc No. 171 | 0116340-0116502 | 8, 9, 11, 12 |

## **REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b), Plaintiffs respectfully request this Court set a hearing date to allow one hour of oral argument on the motion as it would be helpful to the Court due to the complex and ongoing nature of the federal agencies' actions.

**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs Center for Biological Diversity, Calusa Waterkeeper, and Waterkeeper Alliance (collectively, Conservation Organizations) submit this motion for partial summary judgment on Counts 2-5 of their Complaint (ECF No. 1). As explained in the memorandum in support of this motion, Defendants U.S. Army Corps of Engineers (Corps); U.S. Fish and Wildlife Service (FWS); the Department of the Interior (DOI) National Marine Fisheries Service (NMFS); along with Colonel Andrew Kelly, David Bernhardt, Aurelia Skipwith, and Dr. Roy Crabtree in their official capacities (collectively, Agencies), are violating the Endangered Species Act (Act) and the Administrative Procedure Act (APA) by refusing to formally consult over the ongoing harms caused by the Corps' management of Lake Okeechobee (Lake) under the Lake Okeechobee Regulation Schedule (LORS).

Conservation Organizations request the Court declare that the Agencies are violating the Act by relying upon an unlawful biological opinion and by refusing to reinitiate formal consultation, and that the Corps is violating the Act by failing to utilize its authorities to conserve listed species. Conservation Organizations further ask that this Court order the Agencies to reinitiate formal consultation under Section 7 of the Act, require the Corps to utilize its authority to carry out a program for the conservation of listed species pursuant to Section 7(a)(1) of the Act, and enjoin the Corps from further harming listed species until the Corps complies with the statutory and regulatory demands of the Act and the APA.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case is about the Corps' discharge of nutrient-fueled, algae-laden water from Lake Okeechobee into the St. Lucie and Caloosahatchee rivers and estuaries, and the Agencies' refusal to address how these discharges harm federally protected wildlife. The "liquid heart" of the Everglades, AR_006990, the Lake is home to an array of fish and wildlife, including endangered and threatened species. AR_008031–34. The 71-mile Caloosahatchee River flows from the west side of the Lake and empties into San Carlos Bay, which spills into the Gulf of Mexico. AR_003448. The river and estuary are an important warm water refuge, FWS AR_0105740; FWS AR_0105742–44, and provide critical habitat for the federally threatened manatee. AR_003471–72; AR_007763. Five species of federally listed sea turtles frequent the estuary and Gulf of Mexico and some even nest on nearby shores. AR_003473. On the east side of the Lake,

the six-mile St. Lucie River system makes its way through St. Lucie and Martin counties and meets up with the Indian River Lagoon system. AR_001037. Manatees rely on these waters for warm water refuge and other essential habitat needs. AR_0105742–44. Federally protected sea turtles use these waters and nest nearby, AR_001178; AR_008123, and corals live off the coast near the estuary's outlet in the Atlantic Ocean. AR_013241. Smalltooth sawfish are found in both the Caloosahatchee and S. Lucie. AR_010013.

The Lake is heavily polluted by nutrients, particularly phosphorus and nitrogen, AR_013013–33; AR_009539, which have fueled widespread blooms of blue-green algae. AR_012978. The blue-green algae, also known as cyanobacteria, can have liver-harming toxins, and can produce a non-protein amino acid called BMAA (beta-N-methylamino-L-alanine), which has been linked to neurodegenerative diseases. AR_004471–77; AR_003825–38; AR_003308–09. In addition to having serious effects on human health, these "cyanotoxins" kill and injure fish and wildlife. For example, scientists discovered high concentrations of BMAA in dead fish in the Caloosahatchee River, AR_003343, and in dolphins in the Indian River Lagoon. AR_003008–09. But even non-toxic species of algae can harm marine ecosystems. When massive blooms of algae die and decompose, they deplete the oxygen in the water, causing marine species to flee or die. AR_010158.

Since 2008, the Corps has managed the Lake's levels pursuant to LORS, AR_008030, releasing large volumes of nutrient-rich, algae-laden water into the Caloosahatchee and St. Lucie. AR_012979. Under LORS, the Lake and estuaries have experienced several algae blooms. In 2016, a bloom of more than 200-square miles resulted in beach closures and the Governor declared a state of emergency. AR_008196; AR_012881. Two years later, Florida experienced the largest blue-green algae bloom on record, AR_012988, and at the same time suffered a massive red tide bloom that lingered for nearly a year and killed thousands of tons of marine wildlife, including manatees and sea turtles. AR_013063–65; AR_013090–92. Like blue-green algae, red tide is a type of "harmful algal bloom" (HAB) that scientists believe is fueled by phosphorus and nitrogen. AR_002690–99; AR_003952.

Following several sustained summers of HABs, which harmed sea turtles, manatees, corals, and other listed species, the Corps finally acknowledged that LORS influences HABs, finding that its discharges "can lower salinities in the estuary and provide nutrients that promote blue green algae blooms and can transmit blue green algae from Lake Okeechobee to the estuaries."

2

AR_010159. And while the Corps found that there is "a less direct link" between the effects of the discharges and red tide, AR_010159, the Corps began planning for a deviation from LORS "in anticipation of and following" HABs in order to reduce risk to public health and safety. AR_010158.

Despite these acknowledgments, the Agencies have never consulted on the effects of LORS' HABs on species listed under the Act. AR_000930–001009; AR_009176–9338; AR_009530–44; AR_010064–65; AR_00564–49. Even after Conservation Organizations notified the Agencies of their intent to sue for their failure to consult with each other under the Act regarding these harms, and provided the Agencies with dozens of studies, technical data, and other scientific information indicating LORS may affect listed species due to its influence on HABs, FWS and the Corps still refuse to reinitiate formal consultation, as required by the Act and its implementing regulations.[2] This dereliction flows from the Agencies arbitrarily and unlawfully ignoring mountains of record evidence that LORS not only "may affect" listed species—the legal standard for pursuing consultation—but is actually harming imperiled animals and plants in the region. It also means that, in violation of the Act, FWS has never established an allowable amount of take due to HABs, and the Agencies have never ensured LORS is not jeopardizing listed species or destroying their habitats due to HABs.

## LEGAL FRAMEWORK

### I.     Endangered Species Act

Congress intended the Act not just halt, but "reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The Secretary of the DOI administers the Act through FWS, and the Department of Commerce through NMFS for marine species. FWS has jurisdiction over terrestrial species, the manatee, and sea turtles while they are on land. NMFS has jurisdiction over marine species, including sea turtles while they are in the water. If a federal action,[3] like LORS, may affect a listed species, the federal agency taking the action must "consult" with FWS/NMFS to determine whether and how much the

---

[2] The Corps transmitted its biological assessment on some of the species at issue in this case to NMFS on Oct. 28, 2019. AR_010324–48; ECF No. 29 at 2 (indicating that "NMFS and the Corps have reinitiated consultation"). FWS concurred with the Corps that reinitiated consultation is not warranted. AR_010064–65.

[3] Actions includes those that directly or indirectly cause "modifications to the land, water, or air." 50 C.F.R. § 402.02.

action will harm listed species and whether it is likely to "jeopardize" the species' continued existence or result in the destruction or adverse modification of their critical habitats. 16 U.S.C. § 1536(a)(2).[4] An action will cause "jeopardy" if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."50 C.F.R. § 402.02. "Destruction or adverse modification" of critical habitat means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. *Id.* Even if jeopardy is not suspected, consultation is still required to determine the amount and effect of the expected harm to the species. *Id.* § 402.14(h)(3).

Consultation begins with the action agency, here the Corps, preparing a "biological assessment" to determine whether the project is likely to affect listed species or their critical habitats. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If the action agency determines that the proposed action may affect listed species or their critical habitats, it must engage in formal consultation with FWS/NMFS and FWS/NMFS must prepare a biological opinion. 50 C.F.R. §§ 402.12(g), 402.14(a); *Fla. Key Deer v. Brown*, 364 F. Supp. 2d 1345, 1353 (S.D. Fla. 2005). The threshold for triggering formal consultation is "very low" and "any possible effect . . . triggers formal consultation requirements." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

Once the agencies initiate formal consultation, FWS/NMFS reviews all relevant information to "evaluate the effects of the action and cumulative effects on the listed species," and formulates its biological opinion as to whether the action," taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species . . ." 50 C.F.R. § 402.14(g)(1)–(4). This evaluation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This process concludes with FWS/NMFS issuing a "biological opinion" explaining how the proposed action will affect listed species or critical habitat. *Id.* § 1536(b); 50 C.F.R. § 402.14. If the biological opinion concludes that the action is not likely to jeopardize species, or result in the destruction of critical habitat, but may "take" listed species, FWS/NMFS must provide an incidental take statement that specifies "the impact, i.e., the amount or extent, of . . .

---

[4] "Harm" includes significant habitat modification or degradation that results in death or injury to listed species "by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.

incidental taking" that may occur. 50 C.F.R. § 402.14(i)(1).[5] The biological opinion also provides "reasonable and prudent measures" necessary or appropriate to minimize impacts, and sets forth the "terms and conditions" that the action agency must comply with. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i).

Federal agencies must reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "[i]f the amount or extent of taking specified in the incidental take statement is exceeded." 50 C.F.R. § 402.16. "The duty to reinitiate consultation lies with both the action agency and the consulting agency." *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1122 (N.D. Cal. 2017).

Federal agencies are also required to "utilize their authorities in furtherance of the purposes of [the Act]" and to "carry[ ] out programs for the conservation of" listed species. 16 U.S.C. § 1536(a)(1). The Act defines "conservation" to mean the use of "all methods and procedures" necessary to recover listed species to the point where protections under the Act are no longer necessary. *Id.* at § 1532(3). Thus, Section 7(a)(1) requires each federal agency to ensure its actions are consistent with the recovery of listed species. *See* 50 C.F.R. § 402.15(a).

## II.    Standard of Review

Review of agency actions under the Act is provided by the APA. 5 U.S.C. § 704; *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006). The court must review the administrative record, and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An action is "arbitrary and capricious" if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

---

[5] To "take" an endangered or threatened species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it, or "to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" is defined as intentional or negligent actions that create a likelihood of injury to listed species "to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." 50 C.F.R. § 17.3.

5

"Courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) (quoting *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986)). An agency "cannot ignore the requirements" of its own policies and procedures. *Id.* Additionally, "agency actions must be reversed as arbitrary and capricious when the agency fails to examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Id*. at 5 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "When applying the APA to review administrative records under the ESA, the court resolves the issues based on the agency's administrative record." *Fla. Key Deer v. Brown,* 364 F. Supp., at 1351. Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

The record shows that even though the Corps has discharged nutrient-laden, toxic algae water from the Lake for years, which has harmed listed species, the Agencies have never formally consulted on these effects under the Act. AR_000930–001009; AR_009176–9338; AR_009530–44; AR_010064–65. Accordingly, Conservation Organizations notified the Agencies of their intent to sue under the Act for the Agencies' failure to reinitiate consultation on LORS with respect to HABs and their effects on listed species. AR_009389–9428. In response, the Corps sent FWS a letter stating that even though it was "aware that there are concerns regarding the relationship between LORS 2008, harmful algal blooms, and listed species" it did not have "any information suggesting" any of the criteria for reinitiating consultation had been met. AR_009531. FWS agreed with the Corps' determination, stating that "none of the reinitiation triggers for consultation have been met." AR_010065.

The Agencies' refusal to consult on the effects of HABs on listed species appears to hinge on two positions not supported by record evidence. First, while the Corps now finally acknowledges that its management of the Lake influences blue-green algae blooms, AR_010136 ("The Corps is preparing NEPA documentation for a planned deviation from LORS 2008 in anticipation of and following freshwater harmful algae blooms (HABs) with the goal of reducing the risk to public health and safety associated with HABs"), it appears to be the Agencies' position that there is uncertainty as to whether blue-green algae affects listed species. Second, while the Corps readily

6

acknowledges that red tide does impact listed species, it appears to be the Agencies' position that there is uncertainty as to whether the Corps' nutrient-laden discharges influence red tide.

Neither position is supported by the record; furthermore, even if such uncertainty did exist, the Agencies must rely on the best *available* science, and if any doubt remains, the benefit must go to the species. *Miccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1267 (11th Cir. 2009) (agencies "cannot hide behind uncertain scientific data to shirk their duties under the Act"); H.R. Rep. No. 96–697, at 12 (1979). The Agencies are violating the Act because (1) FWS' issuance of and the Corps' reliance upon FWS' 2018 biological opinion ignoring HABs is arbitrary and capricious in the face of record evidence; (2) the Agencies have failed to reinitiate consultation on the 2018 biological opinion despite new information triggering reinitiation of consultation; and (3) the Corps has failed to utilize its authorities regarding LORS in furtherance of the purposes of the Act.

## I.    FWS' 2018 Biological Opinion and the Corps' Reliance Upon It is Arbitrary and Capricious.

Despite Congress' clear intention that agencies "halt and reverse the trend toward species extinction, whatever the cost," *Tenn. Valley Auth. v. Hill*, 437 U.S. at 180, the Corps and FWS have never consulted on the impacts of LORS on HABs and the impacts of HABs on listed species under the Act. In its initial environmental analysis of LORS in 2007, the Corps only briefly mentioned HABs, noting that "a small percentage of algae produce toxins," and that even non-toxic algae can have harmful effects on marine ecosystems when masses of algae die and decompose, depleting oxygen in the water. AR_001141. The Corps acknowledged that population growth and "other anthropogenic factors have led to significant nutrient enrichment of Florida coastal waters over the past several decades," that "most scientists agree that runoff could help maintain a bloom once it migrates near enough to shore," and that nutrients from a combination of sources like river flow and groundwater are sufficient to generate and maintain in-shore blooms, but ignored that information and concluded that "[i]t is unlikely that discharges from Lake Okeechobee are a prerequisite for HAB formation." AR_001142. The Corps' 2006 biological assessment to FWS does not even mention HABs. AR_000472–87. Meanwhile, FWS' 2007 biological opinion on LORS says that eutrophication of the Lake, especially phosphorus, promotes blooms of cyanobacteria, AR_000981, and that "while there may be a potential connection" between LORS discharges and red tide, "researchers have been unable to establish a direct link." AR_000933.

At the height of Florida's HAB crisis, the Corps and FWS reinitiated consultation on the 2007 biological opinion because new case law required it to update numerical take for the snail kite. FWS AR_0116340. This formal consultation culminated in July 2018 with FWS' biological opinion, which, like the 2007 biological opinion, is virtually silent on the subject of HABs. FWS' 2018 biological opinion does not even discuss the severe ongoing HABs occurring at the time, or any HABs since 2007. FWS' 2018 biological opinion is arbitrary and capricious, and violates the Act and the APA, because its environmental baseline does not incorporate past and ongoing harm from HABs, because it excludes areas impacted by the discharges and HABs from the action area, and because it fails to consider the impacts of LORS on the recovery of listed species. The Corps' reliance on this unlawful biological opinion is also arbitrary and violates the Act.

## A. FWS' 2018 Biological Opinion is Unlawful Because Its Environmental Baseline Does Not Incorporate Harm from Harmful Algal Blooms.

Even though FWS must use "the best available scientific and commercial data available," 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), it ignored readily available information about the ongoing HABs when it issued its 2018 biological opinion. In reviewing the lawfulness of a biological opinion, the "Court is required to consider whether the agency has considered all relevant information." *Fla. Key Deer v. Brown*, 364 F. Supp. at 1354–55. Section 7(a)(2) requires FWS to "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat," 50 C.F.R. § 402.14(g)(3), by describing the environmental baseline which includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area . . . and the impact of State or private actions which are contemporaneous with the consultation in progress." *Id.*; *Fla. Key Deer v. Brown*, 364 F. Supp at 1353–54; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 929–33 (9th Cir. 2008) (holding a biological opinion must incorporate a degraded baseline).

The 2018 biological opinion's review of HABs is scant, AR_116378, AR_116410, and the Corps' biological assessments are silent. AR_007348–7406; AR_007653–7720; AR_007956–8011; AR_008022–78. The 2018 biological opinion found that even though the phosphorous goal for the lake is 40 parts per billion (ppb), phosphorous in the Lake has more than doubled, from 49 ppb to 118 ppb, and that higher concentrations of phosphorous promote cyanobacteria blooms. FWS AR_0116409–10. The opinion also found that "when herbivores consume hydrilla

while this cyanobacteria and the neurotoxin are present, they can display loss of muscle control resulting in difficult flying, swimming, and eventual death," FWS AR_0116378, and that while some birds in the region showed signs of avian vacuolar myelinopathy—a neurological disease caused by consuming blue-green algae toxins, there have been no reported sightings of affected snail kites. *Id.* Aside from these passing, alarming findings, FWS did not analyze how HABs may affect other listed species. FWS AR_0116341; FWS AR_0116359. And while the opinion found that submerged aquatic vegetation for foraging, shallow areas for resting and calving, channels for travel and migration, warm water refuges, and fresh drinking water are essential features of designated manatee critical habitat, FWS AR_0116360, it did not discuss the impact of past HABs that may be linked to Lake discharges on manatees or their habitat. This minimal discussion ignored record evidence that FWS was required to include in the 2018 biological opinion's environmental baseline. 50 C.F.R. § 402.14(g)(3).

By the time of the 2018 update to the 2007 biological opinion, the Corps and FWS should have known that LORS influences HABs. The Corps' weekly meetings with LORS stakeholders have been tracking red tide and blue-green algae since at least 2014.[6] In 2015, Florida's algae bloom response team acknowledged that increases in nutrients can exacerbate the extent, duration, and intensity of HABs, AR_005620, and an April 28, 2015 Corps document called "Lake Okeechobee Algae Bloom: Recommendations/Talking Points" makes recommendations for avoiding a larger algae bloom. AR_005613. In 2016, a 200-square mile HAB occurred in the Lake during nearly year-round discharges to the estuaries. AR_008196. Beaches were closed and the Governor declared a state of emergency in Martin, St. Lucie, Palm Beach, and Lee counties. AR_012894. Lt. Col. Reynolds told Corps staff "I am hearing a lot about the brown water in the estuaries, dead animals on the coasts, and air quality issues on West coast due to releases…What is the truth to any of these and what is the actual scientific descriptions?" AR_006364. The response from staff was "There is a red tide coinciding with the brown outfall of watershed mixed with Lake run off that is moving south from Caloosahatchee along the coast. … Red tide can kill fish and cause health problems, but is not linked to LO releases." *Id*. A few hours later,

---

[6] The record only includes weekly reports 2014-2016. Most of these weekly reports indicate the presence of red tide, blue-green algae, or both. *See* the Corps' ESA Administrative Record Index, ECF No. 23-3.

the same staff confirmed that "once red tide is in a nearshore area where basin and Lake flow are bringing in nutrients it can persist longer under the right conditions." AR_006361.

Heavy rain from Hurricane Irma and above-average rainfall in May 2018 set the stage for the largest ever summer algal bloom in Lake Okeechobee. AR_012988–90. The Corps initiated multiple discharges of toxic algae-filled water into the estuaries and Florida's Governor once again declared a state of emergency. AR_013063–65. When Lt. Col. Reynolds asked about red tide again in July 2018, staff replied "No direct linkage to our operations that I am aware of. Higher nutrient levels probably (ok pretty sure) enhance algal blooms." AR_009341. Staff asserted that "it is speculated but not confirmed that additional nutrient loading may fuel or enhance red tide bloom." AR_009367. The Corps discharged 50% more water than average to the Caloosahatchee and St. Lucie that year, doubling the total nitrogen and nearly tripling the total phosphorous it normally discharges downstream. AR_009539.[7]

At the very least, the Corps and FWS were required to acknowledge the existence of information explaining the connections between LORS, HABs, and harm to listed species and explain why that information did not constitute the best available science. "An agency 'cannot ignore available biological information or fail to develop protections' which may indicate potential conflicts between the proposed action and the preservation of endangered species." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000) (quoting *Conner v. Burford,* 848 F.2d 1441,1454 (9th Cir. 1988)); *see also Dow AgroScience LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (holding an agency must "at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data"). As such, FWS' failure to consider this information renders its decision arbitrary and capricious and the biological opinion unlawful. *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1283 (S.D. Ala. 1998) (holding that a biological opinion is unlawful when "many of the important 'facts' on which FWS based its decision appear to be assumptions, presumptions, or conclusions themselves—not facts based on any evidence, documents, or data in the Administrative Record").

---

[7] This document cites the South Florida Water Management District's *2019 South Florida Annual Report – Volume I, Chapter 8C: St. Lucie and Caloosahatchee River Watersheds Annual Report*, which in accordance with the Corps' Index, counsel for the Agencies agree is part of the Administrative Record, as it is a document referenced within a Corps' document but was not distinctly filed with the Court. Plaintiffs provide the document in its entirety as Exhibit A.

Because FWS must consider the best available scientific data in preparing its biological opinions, 16 U.S.C. § 1536(a)(2), it was required to include this record information in the 2018 biological opinion's environmental baseline. *Fla. Key Deer v. Brown*, 364 F. Supp. at 1353; *Conner v. Burford*, 848 F.2d at 1454 ("In light of the ESA's requirement that the agencies use the best scientific and commercial data available to insure that protected species are not jeopardized . . . the FWS cannot ignore available biological information"). Given the ongoing concerns, agency communications, and science regarding the links between LORS and HABs, this information at the very least should have been part of FWS' environmental baseline. Instead, FWS turned a blind eye and the 2018 biological opinion failed to even mention the ongoing HABs.[8]

### B. The 2018 Biological Opinion is Unlawful Because FWS Improperly Limits the "Action Area."

The 2018 biological opinion is further deficient because it uses an overly narrow definition of the LORS "action area," which results in the exclusion of impacts to species in the Caloosahatchee from the environmental baseline. The Act's implementing regulations define the "action area" as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir. 2002) (finding the agency improperly failed to determine which areas would "actually be affected" by the agency action); *see also Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128–29 (D.D.C. 2001). Despite the discharge of nutrient and algae-laden water into the estuaries, FWS limited its analysis of LORS impacts to only the "water bodies that a snail kite may use during its lifetime" which do not include the Caloosahatchee. FWS AR_0116355. As a result, the 2018 biological opinion excludes impacts to the manatee and its habitat in the Caloosahatchee, and habitat for nesting sea turtles. By limiting the "action area" to the Lake and not including the Caloosahatchee, which receives Lake discharges, FWS violated the Act and its implementing regulations.

### C. The 2018 Biological Opinion is Unlawful Because It Fails to Consider or Address Impacts of LORS on the Recovery of Listed Species.

---

[8] FWS also failed to consider the effect of climate change, specifically as it relates to precipitation and HABs. FWS AR_0116340–0116502. The record contains numerous studies on how climate change is likely contributing to the growth and prevalence of harmful algal blooms. AR_004592–94; AR_005664–69; AR_008569–72; AR_005884–85; AR_003999–4003; AR_002574–76; AR_002878–89; AR_000173–76; AR_005898–956.

FWS' 2018 biological opinion fails to consider the potential impacts of LORS on the recovery of affected listed species. The goal of the Act is not to keep a species under the Act's protection forever, but to recover it to the point where it no longer requires the protection of the Act. 16 U.S.C. § 1532(3). FWS must determine whether the action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. The Act and its implementing regulations require FWS to make a specific determination as to whether LORS would "reduce appreciably the likelihood" that species will recover. *Nat'l Wildlife Fed'n*, 524 F.3d at 931 (noting survival and recovery are "intertwined needs that must both be considered in a jeopardy analysis"). Recovery must "be considered explicitly and separately from survival." *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 999 (D. Ariz. 2011). "Recovery means more than just improved status; it means improvements to the point where the species may be delisted." *Ctr. for Biological Diversity v. Provencio*, No. CV 10-330 TUC AWT, 2012 U.S. Dist. LEXIS 50457, at *42, 2012 WL 966031, at *12 (D. Ariz. Jan. 23, 2012). In this recovery analysis, FWS must identify when a species "will likely pass the tipping point for recovery, and determine whether the proposed action will cause the species to reach that tipping point." *Id*. This is required because it "provides some reasonable assurance" that the action "will not appreciably reduce the odds of success for future recovery planning, by tipping a listed species too far into danger." *Nat'l Wildlife Fed'n*, 524 F. 3d at 936.

The 2018 biological opinion fails to consider the impacts of LORS on the recovery, or even the survival, of several federally listed species that occur within areas affected by HABs, including the manatee; wood stork; Florida panther; crested caracara; and loggerhead, leatherback, green, Kemp's ridley, and hawksbill sea turtles. FWS AR_0116340–0116502. Even if FWS found that LORS would not appreciably reduce the likelihood that these species will survive, it must still have considered whether LORS would appreciably reduce the likelihood these species will recover. FWS has done neither.

**D.  The Corps Has Not Satisfied Its Independent Duty to Ensure Against Jeopardy.**

The Corps has an independent duty to ensure that its actions are not likely to jeopardize listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). "While consultation may satisfy the action agency's procedural obligations under the ESA, the action agency cannot

rely solely on the consulting agency's recommendations to conclusively establish its compliance with the substantive requirements of the ESA." *Fla. Key Deer v. Brown*, 364 F. Supp. at 1358. FWS' 2018 biological opinion on LORS violates the Act and APA and is unlawful; therefore, the Corps' reliance on the biological opinion absent any evidence of an independent evaluation to fulfill its Section 7 substantive obligations is also arbitrary, capricious and violates the Act. *Id*. Furthermore, without a valid biological opinion from FWS, the Corps does not have incidental take authorization; therefore, the Corps' actions under LORS also violate Section 9 of the Act where they are causing unauthorized take. 16 U.S.C. §§ 1536(b)(4), 1538.

## II. The Agencies' Refusal to Reinitiate Formal Consultation Violates the Endangered Species Act.

### A. The Agencies Must Reinitiate Formal Consultation Because "New Information" Reveals Effects of LORS that May Affect Listed Species or Critical Habitat in a Manner or to an Extent Not Previously Considered.

Even if the 2018 biological opinion was valid when issued—which it was not—the Agencies are still in violation of the Act for failing to reinitiate formal consultation as required by the Act's regulations. The record shows that HABs influenced by LORS may affect listed species or critical habitats in a manner or to an extent not previously considered. 50 C.F.R. § 402.16(a). The Corps recently acknowledged that "[e]vents over the past few years may present new information relevant to consultation and circumstances related to blue-green algae blooms and red tide warranting discussion and coordination." AR_009913. Yet, despite ample new information regarding how LORS influences HABs and how HABs impact listed species, the Corps and FWS decided not to reinitiate formal consultation, AR_010064–65, and the Corps and NMFS have not yet concluded consultation.[9] This failure is most stark with respect to the manatee, but applies to all listed species in the estuaries.[10]

#### 1. The Record Shows LORS is Contributing to Blue-Green Algae Blooms Which May Affect Listed Species in a Manner Not Previously Considered.

---

[9] The Corps transmitted its biological assessment on some of the species at issue in this case to NMFS on Oct. 28, 2019. AR_010324–48. The Corps and NMFS last consulted on LORS in 2015 and failed to analyze HABs then too. AR_005642–49.

[10] In addition to manatees, FWS is responsible for the survival and recovery of Everglades snail kites, wood storks, bald eagles, Cape Sable seaside sparrows, eastern indigo snakes, Okeechobee gourds, Florida bonneted bats, Florida panthers and Florida crested caracaras, AR_009912, as well as loggerhead, leatherback, green, Kemp's ridley, and hawksbill sea turtles while on land.

The Corps, in its recent announcement that it plans to deviate from LORS, acknowledged that it has previously kept the Lake too high, impacting water quality by increasing total phosphorus, which led to HABs. AR_009382. In planning this deviation from LORS, the Corps found that "[r]esearch has documented that high lake stages and nutrient levels increase the risk of HABs appearing on Lake Okeechobee, which then become a concern in the estuaries due to effects on Lake Okeechobee releases." AR_009469–70.

While the Corps recognizes that LORS impacts blue-green algae, it refuses to acknowledge that blue-green algae may affect listed species. In a 2019 letter to FWS regarding consultation, in response to Conservation Organizations' notice letter, the Corps cited only a single FWS webpage to support its position that blue-green algae does not affect manatees. AR_009913. That webpage states that "no direct health effects on manatees have been confirmed related to the blue-green algae bloom." AR_009452. However, even the webpage acknowledges that cyanobacteria "if present for extended periods of time, shade out aquatic grassbeds to die" and that this loss "will cause manatees to feed elsewhere." *Id*. The Act considers these types of impacts "harm" and "harassment," especially when they occur in instances of significant impairment or disruption of behavioral patterns, like feeding. *See* 50 C.F.R. § 17.3. Yet, there is no record evidence that the Corps further evaluated whether manatees have exhibited avoidance behaviors in response to LORS or HABs. *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007) (holding it is arbitrary and capricious for an agency to "offer[] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Moreover, the Agencies have never addressed the avalanche of new information that indicates blue-green algae may affect listed species. For example, cyanobacteria toxins have been observed in high concentrations in fish in the Caloosahatchee River. AR_003343. Bottlenose dolphins that have died in the Indian River Lagoon have had similar concentrations of BMAA in their brains as humans that have died of neurodegenerative diseases. AR_003008–003009; s*ee also* AR_009367; AR_003825; AR_006343–46; AR_004471–77; AR_004124–27; AR_002840; AR_002842. Rather than acknowledge this information indicates that HABs may affect listed species and reinitiate formal consultation, the Corps instead lamented "without spending more money on tissue analysis we will not be better able to confirm the lack of

microcystin in the dead manatees."[11] AR_009472. In its letter concurring with the Corps that reinitiation of consultation is not warranted, FWS conceded that "it is still unclear if toxins produced by cyanobacterial HABs affect manatee health." AR_010064–65. This record evidence showing LORS "may affect" listed species clears "the low threshold" requiring reinitiation of consultation. *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1228–29 (S.D. Fla. 1994).

### 2. The Record Shows LORS is Contributing to Red Tide Blooms, Which May Affect Listed Species in a Manner Not Previously Considered.

In a 2019 letter to FWS regarding consultation, the Corps conceded that "most scientists agree that runoff could help maintain" red tide, but then, citing Brand (2007) and MOTE (2019), posited that whether red tides have increased and whether those increases are related to Lake discharges "is a highly debated topic." AR_009914. These records actually support a finding that the nutrients the Corps discharges via LORS may affect listed species by influencing red tide. Brand (2007) found that red tide concentrations are higher near the shoreline than offshore, and that nutrient-rich freshwater runoff from land is likely to be a major source of nutrients for the development of red tides. AR_000664–95. MOTE (2019) found that nutrients carried in freshwater outflows "have the potential to serve as additional 'food' sources" for red tide, and that the "potential linkages between nuisance algal blooms in the estuary," outflows from Lake Okeechobee, and red tide "is an important topic that needs further research." AR_010293. To the extent there is uncertainty as to the precise nature of this relationship, the Act's overarching purpose to protect listed species and its best available science requirement dictate that the Agencies must reinitiate consultation because LORS may affect listed species. *Conner v. Burford*, 848 F.2d at 1454; *see also Pac. Coast Fed'n of Fisherman's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093 (9th Cir. 2005) (holding that the proper analysis "is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed action in the present and future human and natural contexts.").

Florida's most recent red tide, which correlated with exceptionally high volumes of water and nutrients from Lake Okeechobee, started in October 2017 and by November 2018 had reached the Florida panhandle and wrapped around the southern tip of Florida and up the

---

[11] The blue-green algae *Microcystis aeruginosa* can produce a family of toxins known as microcystins. AR_002845.

Atlantic coast. AR_013074–76; AR_013055–56. By October 2018, red tide had closed sea turtle nesting beaches in several south Florida counties. AR_013063–65. Red tide contributed to the deaths of 207 manatees in 2018, AR_013099–13103; AR_013066–67, and at least 540 sea turtle strandings in southwest Florida.[12] AR_013080–83. Scientists have linked red tide to land mammal and bird mortality. AR_004616–25; AR_000274–82; AR_004389–98. Exposed fish and seagrasses can accumulate high concentrations of brevetoxins and act as toxin vectors to dolphins and manatees. AR_000372–77. When red tide reaches concentrations above 100,000 cells/l, it leads to fish kills, shellfish toxicity, and respiratory distress. AR_009172–75; AR_003307; AR_003839–44. At these concentrations, the twelve brevetoxins produced by red tide can and have killed marine animals, including fish, sea turtles, manatees, sea birds, and dolphins. AR_003307; AR_004505–23; AR_013093–98; AR_000265–73. Brevetoxins bind to manatees' brains, leading to edema and hemorrhaging, AR_000004–10, and ultimately death. AR_002705–14; AR_000048–57.

The Lake has been besieged by nutrient pollution and is facing a water quality crisis. AR_013013–33. From 2013–2017, inflows into Lake Okeechobee exceeded the total maximum daily load of 140 metric tons of total phosphorous by over 350 tons, and in 2018, total phosphorous spiked to 1,046 metric tons. AR_009539. There was also a spike in total nitrogen. *Id*. The Corps then pushed these HAB-feeding nutrients downstream to the Caloosahatchee and St. Lucie. *Id*. Prior to and during the worst red tide recorded in recent history, the Corps discharged twice as much nitrogen and nearly three times as much phosphorous as its 20-year average from the Lake into the Caloosahatchee and St. Lucie. Exhibit A.

In addition to Brand (2007) and MOTE (2019), there is additional information not previously considered by the Agencies in the 2018 biological opinion that demonstrates the potential connection between LORS and red tide. Scientists associate red tide with river runoff, pollution, and other nutrient-enriching phenomena produced by human activities. AR_002690–99 (finding a nutrient source of a HAB could be nutrient-rich water from the Caloosahatchee); AR_012527–40 ("During average estuarine flow years, combined estuarine sources contribute up to 17 and 69% of the N and P needs of these blooms, however local estuarine contribution can increase to 100% for exceptional, high flow years."); AR_009365–66 (reporting Mote Marine Laboratory

---

[12] A stranded sea turtle is one that is found on land or water, dead, injured, or exhibiting illness or abnormal behavior.

scientists claim Lake pollution may enhance red tide); AR_011454–65 (finding that while the origin of red tide varies, "there is good agreement" that when red tide encounters "nutrient-enriched conditions, growth and bloom intensity" may be enhanced). The Department of Interior's conservation plan for the JN Ding Darling National Wildlife Refuge, which bridges the Caloosahatchee and Gulf of Mexico, found that "blue-green algae blooms, red tides, and massive accumulation of drift algae have indicated that nutrient loads to the Caloosahatchee are too high." AR_003450. It also found that "[t]he result of nutrient loading combined with too much or too little freshwater flowing to the Caloosahatchee River is a degraded estuarine ecological community" with documented "declines in the abundance and diversity of marine and estuarine species" and a "lack of suitable habitat" that causes stress for manatees and wood storks. *Id*.

Instead of carefully reviewing this information, FWS reported it had "consulted with experts in HABs and manatees from state and Federal agencies" and concurred with the Corps that reinitiation of consultation is not warranted. AR_010064. Yet, the administrative record prepared by FWS does not contain any records reflecting FWS' consultation with "experts in HABs and manatees." FWS AR_0100000–116582. A court may not accept bald assertions unsupported by the administrative record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43 (holding a court must overturn agency action if the agency "offered an explanation for its decision that runs counter to the evidence before the agency"); *Defs. of Wildlife v. Babbitt*, 958 F. Supp. 670, 681 (D.D.C. 1997) (finding FWS' decision arbitrary and capricious where its claims were "supported by no citation to scientific evidence, study, or data of any kind" and "flies in the face of the overwhelming evidence"). Therefore, FWS' concurrence that there was no new information indicating that HABs may affect listed species lacks both a factual foundation and a rational basis. *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273, 1375 (S.D. Fla. 2006), *rev'd in part,* 526 F.3d 1353 (11th Cir. 2008) (remanding FWS' concurrence with the Corps' not likely to adversely affect determination regarding the impact of a project because the record revealed "at a minimum, there is an effect on the species and formal consultation should have been initiated").

The record shows that the low threshold for reinitiating consultation on the basis of new information has been met with respect to both blue-green algae's impacts on listed species and LORS' impacts on red tide. "Any possible effect, whether beneficial, benign, adverse, or of an underdetermined character, triggers" consultation. *Fla. Key Deer v. Stickney*, 864 F. Supp. at 1228–29. "The threshold for formal consultation *must be set sufficiently low* to allow Federal

agencies to satisfy their *duty* to "insure" under Section 7(a)(2)." *Id.* (quoting 51 Fed. Reg. at 19,949–950 and supplying emphasis). To the extent the Agencies refused to reinitiate consultation due to a lack of certainty, they cannot ignore the best available information "simply because it falls short of absolute scientific certainty." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1147 (9th Cir. 2007) (citation omitted); *see also Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010) (the best available data standard "does not require that the [Service] act only when it can justify its decision with absolute confidence" (citations omitted)). Rather, "[e]ven if the available scientific and commercial data were quite inconclusive, [the Service] may—indeed must—still rely on it." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000) (citation omitted); *see also Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (holding the best scientific data available standard does not mean "the best scientific data possible").

**B.  The Agencies Must Reinitiate Formal Consultation Because the Corps is Exceeding Take From the 2018 Biological Opinion.**

Reinitiation of formal consultation is also required because the Corps' actions regarding the Lake and HABs are taking multiple listed species but the 2018 biological opinion only provides a take statement for snail kites. The opinion does not provide a take statement for manatees; wood storks; nesting loggerhead, leatherback, green, Kemp's ridley, or hawksbill sea turtles; or any other endangered or threatened species impacted by LORS, meaning the allowable amount of take for each of these species is zero. *See* 50 C.F.R. § 402.16(a). The record shows that hundreds of manatees and loggerhead, Kemp's ridley, and green sea turtles died in southwest Florida in 2018 due to red tide. AR_013090–92; AR_013100–03. Record evidence confirms that LORS is likely contributing to the intensity and duration of HABs, including red tide. *Supra* at IIA2. Yet, FWS has not authorized take of these listed species due to LORS; therefore, the Agencies must reinitiate consultation to establish an allowable amount of take.

**III.  The Corps Has Failed to Utilize Its Authorities in Furtherance of the Endangered Species Act.**

This case presents a unique situation in which the Corps' management of the Lake has resulted in the discharge of billions of gallons of water containing tons of algae and nutrients, which in turn has wreaked havoc on listed species and their habitats, and yet the Corps has not undertaken a program aimed at conserving those species. AR_012979; AR_012277. All federal agencies must "utilize their authorities in furtherance of the purposes of" the Act and to "carry[ ]

out programs for the conservation of listed species." 16 U.S.C. § 1536(a)(1). "Conservation"
means the "use of all methods and procedures which are necessary to bring any endangered
species or threatened species to the point at which the measures" provided by the Act "are no
longer necessary." *Id*. § 1532(3). To fulfill this requirement, "a federal agency must develop a
program aimed at improving the viability of a species so that it eventually may be delisted." *Fla.
Key Deer v. Brown*, 364 F. Supp. at 1360. This duty is specific, rather than generalized, *id*. at
1361, and agencies "must in fact carry out a program to conserve, and not an 'insignificant'
measure that does not, or is not reasonably likely to, conserve endangered or threatened species."
*Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th Cir. 2008).

The need for a conservation program that furthers the recovery of listed species impacted by
LORS is particularly warranted, given the size, scope, and location of LORS;[13] its significant
impacts on species throughout the years; and its impacts across the Greater Everglades
ecosystem. AR_012979; AR_012277. LORS impacts the wood stork; manatee; snail kite;
smalltooth sawfish; Cape Sable seaside sparrow; eastern indigo snake; Okeechobee gourd;
Florida bonneted bat; Florida panther; crested caracara; several species of coral; and loggerhead,
leatherback, green, Kemp's ridley, and hawksbill sea turtles. Indeed, the Corps has not even
engaged in formal consultation with FWS on HAB impacts as required by Section 7(a)(2) of the
Act.

The Department of Interior has determined that LORS' "nutrient induced algae blooms and
the resulting hypoxia caused extensive fish kills," AR_003451, that LORS has negatively
impacted manatee and sawfish habitat, negatively impacted sea turtles and fisheries; and
destroyed "virtually all other filter feeding organisms ranging from barnacles to sponges to
corals." AR_003450. This record evidence indicates that key assumptions underlying LORS and
HABs have proven inaccurate and led to devastating impacts never before analyzed by the
Corps. There is no record evidence that the Corps has consulted with FWS to carry out a
program that contains any specific, significant measure to conserve species and their habitats, or
that it is in fact doing so. *Fla. Key Deer v. Paulison*, 522 F.3d at 1147 ("While agencies might

---

[13] Five national wildlife refuges are within the Caloosahatchee: J.N. "Ding" Darling National
Wildlife Refuge, Pine Island National Wildlife Refuge, Matlacha Pass National Wildlife Refuge,
Island Bay National Wildlife Refuge, and Caloosahatchee National Wildlife Refuge. Hobe
Sound National Wildlife Refuge and a state aquatic preserve are in the Indian River Lagoon and
St. Lucie Inlet. AR_012285.

have discretion in selecting a particular program to conserve . . . they must in fact carry out a program to conserve."); *see also Sierra Club v. Glickman*, 156 F.3d 606, 618 (5th Cir. 1998). Therefore, the Corps is in violation of Section 7(a)(1) of the Act.

## IV.    The Conservation Organizations Have Standing.

Plaintiff Center for Biological Diversity is a non-profit 501(c)(3) organization that works to protect and conserve endangered species and their habitats. Its members, like Victoria Allen, John Cassani, and Bill Matturo, advocate for the protection of Florida's waters and engage in water-based recreational activities such as fishing, boating, kayaking, canoeing, bird watching, and nature observation on and in Lake Okeechobee, the Caloosahatchee and the St. Lucie, and nearshore coastal waters. Decl. Allen; Decl. Cassani; Decl. Matturro. Its members are concerned with the conservation of imperiled species impacted by the Corps' discharges of HABs and are harmed by the Agencies' failures. Plaintiff Calusa Waterkeeper is a non-profit organization dedicated to the protection of the Caloosahatchee River and its estuary. It monitors the health of these waters and its members, like Jason Pim, John Cassani, Terry Nelson, and Capt. John Cookman, are harmed by the adverse effects of LORS on the Caloosahatchee. Decl. Pim; Decl. Cassani; Decl. Nelson; Decl. Cookman. Plaintiff Waterkeeper Alliance's mission is to make all waters, including Florida's waters, swimmable, drinkable, and fishable. Decl. Estrin. Waterkeeper Alliance members like Calusa Waterkeeper and Lake Worth Waterkeeper, are injured by the Agencies' failures. Decl. Cassani; Decl. Diaz.

## CONCLUSION

The Endangered Species Act, by way of its "language, history, and structure . . . indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities" for protection under the law. *Tenn. Valley Auth. v. Hill*, 437 U.S. at 174. To this end, the Act places both procedural and substantive obligations on federal agencies to ensure their actions do not jeopardize listed species or adversely modify their critical habitat. *Fla. Key Deer v. Paulison*, 522 F.3d at 1133. The Agencies have failed to carry out their duties under the Act. Until the Agencies reinitiate formal consultation, FWS prepares a valid biological opinion, and the Agencies implement significant measures to conserve species affected by LORS, the harm inflicted on manatees, sea turtles, and other imperiled wildlife will continue unstudied and unabated, and in violation of the law.

Respectfully submitted this 31st day of January, 2020.

/s/ Jaclyn Lopez
JACLYN LOPEZ, Trial Counsel
FL Bar No. 96445
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190
Fax: (520) 623-9797
jlopez@biologicaldiversity.org

/s/Jason Totoiu
JASON TOTOIU
FL Bar No. 0871931
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (561) 568-6740
Fax: (520) 623-9797
jtotoiu@biologicaldiversity.org

Attorneys for Plaintiffs